# IN THE COURT OF APPEALS OF TENNESSEE
# AT NASHVILLE
## November 6, 2003 Session

## B&L CORPORATION v. THOMAS AND THORNGREN, INC., ET AL.

**A Direct Appeal from the Chancery Court for Davidson County**
**No. 99-1853-III(II)    The Honorable Carol L. McCoy, Chancellor**

_____

### No. M2002-02355-COA-R3-CV - Filed February 10, 2004

_____

Plaintiff corporation sued former employees/officers alleging breach of non-compete agreements, breach of fiduciary duty, conversion, unfair competition, intentional inducement to breach a contract, and unjust enrichment. The trial court granted employees summary judgment on all claims and, on appeal, this Court affirmed the trial court's grant of summary judgment on breach of non-compete agreements and conversion of intangible personal property claims. This Court reversed the summary judgment on the remaining claims and remanded the case for trial. The pending case on remand was voluntarily dismissed in the trial court and, subsequently, plaintiff sued defendants for the same remanded claims. Defendants moved to dismiss on the doctrine of res judicata (splitting cause of action) and the trial court denied the motion. After a trial on the merits, the trial court entered monetary judgment against defendants. Defendants appeal. We affirm in part as modified and reverse in part.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Affirmed As Modified in Part, and Reversed in Part**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. joined and HOLLY M. KIRBY, J., concurs with Partial Separate Concurrence

Craig V. Gabbort, Jr. and D. Alexander Fardon, Nashville, For Thomas and Thorngren, Inc. and Stephen L. Thomas

Robert E. Boston, Nashville, For Kris R. Thorngren

Robert J. Mendes and Robin B. White, Nashville, for B&L Corporation

**OPINION**

Plaintiff, B&L Corporation ("B&L" or "Plaintiff"),[1] a corporation duly organized and existing under the laws of the State of Tennessee, was chartered in December 1981 by its founder and current president, Mr. Michael P. Brodbine ("Brodbine"), "to provide unemployment cost control systems and other professional services to business entities." B&L's business operation is more precisely defined in its Complaint as follows:

> [B&L] offers its business clients and customers cost control in the unemployment compensation area by implementing procedures to prevent excessive rate charges by government. [B&L] also prevents unwarranted benefit charges through auditing and monitoring of all claims and establishing centralized control over all information for a client that affects their unemployment tax rates. [B&L] further provides training for a client's employees and periodic status reports, all designed to lower unemployment compensation rates.

In the fall of 1982, B&L entered the Targeted Jobs Tax Credit program ("TJTC"). The TJTC was a federal tax credit program that provided employers with federal income tax credits for "hiring individuals who were certified as being in a targeted group."[2] B&L developed a program by which its client-employers could "initiate a procedure to insure the proper tax credit for their company which conformed to the Internal Revenue Service and State employment Targeted Jobs Tax Credit certification units." The TJTC program became a major source of gross revenue for B&L, and plaintiff contributed significant resources to the training of clients and the solicitation of TJTC business.

On January 8, 1982, defendant Stephen L. Thomas ("Thomas") was hired pursuant to a written employment agreement to act as a Director and Vice President of B&L. As part of the agreement, Thomas acquired 20% of the corporate stock from the owner of 100% of the stock, Anne Brodbine. The agreement provided for a one-year term of employment and included the following non-competition covenant:

VII.
Covenant Not to Compete

In consideration of the employment hereunder, Executive hereby agrees that during the term of his employment by the

---

[1] B&L does business under the name U.C. Consultants. In the interest of convenience and consistency, we will continue to refer to B&L as "B&L" or "plaintiff."

[2] B&L notes that Congress replaced this program with the Workers' Opportunity Tax Credit program on October 1, 1996.

-2-

Corporation and for a period of two (2) years after the termination of said employment, Executive will not directly or indirectly own, have a proprietary interest of any kind in, be employed by, or serve as a consultant to or in any other capacity, engage in the business of employment tax compensation consultation without the express written consent of the Corporation. Executive agrees that breach of this covenant contained herein shall result in irreparable and continuing damage to the Corporation for which there is no adequate remedy at law and in the event of any breach of any such agreement, the Corporation shall be entitled to injunctive and such other and further relief, including damages, as may be proper. This covenant shall not apply if Corporation refuses to offer to extend this contract after the expiration of its term.

On July 8, 1992, B&L hired defendant Kris R. Thorngren ("Thorngren"). Thorngren signed a written employment agreement that provided for a one-year term of employment and contained a covenant not to compete nearly identical to the one in Thomas's contract.[3]

During the course of his employment, Thorngren was promoted to the position of Vice President. As a vice president and operating executive, Thorngren was in charge of the corporation's tax rate and audit section, made responsible for unemployment compensation claims, and acted as the corporation's customer liaison with the TJTC program. B&L contends that both Thomas and Thorngren, as executive officers, had access to "B&L's confidential compilation of customer information, including B&L's customer names, the person with decision-making authority at the customer, contract pricing and contract expiration dates."

In late 1992, Brodbine approached Thomas and Thorngren to discuss the possibility of establishing an employee stock ownership plan by which ownership of B&L would be transferred to its employees via a gradual sale of the corporation stock. Thorngren testified that when he and Thomas realized that the employee stock ownership plan was not a viable option, and out of concern that Brodbine was shopping B&L to potential buyers, they decided to make an offer to purchase the corporation.

In the summer of 1993, Thomas and Thorngren first began to discuss the possibility of launching a competing business. Thomas and Thorngren extended offers of employment to B&L employees Gwen Benson ("Benson") and Jean Donnelly ("Donnelly") sometime between July and October 1993. Thorngren testified that defendants also met with an attorney for the purpose of reviewing the validity of their respective employment agreements, and specifically their non-compete agreements. In November or December 1993, Thomas and Thorngren entered into an

_____

[3] The covenant in Thorngren's contract was for "a period of (3) years after the termination" of his employment from B&L.

-3-

agreement to lease office space, acquired or leased office equipment, and arranged for telephone service at the new location.

On January 4, 1994, Thomas and Thorngren met with Brodbine and extended an offer to buy B&L. Brodbine refused defendants' offer and Thomas and Thorngren immediately vacated the premises. The parties dispute whether Thomas and Thorngren voluntarily resigned or were terminated, but the evidence is undisputed that January 4, 1994 was defendants' last day of employment with B&L.

Defendant corporation, Thomas and Thorngren, Inc. ("T&T Corporation"), was chartered on December 1, 1993. The day-to-day operation of T&T began on January 4, 1994, immediately upon defendants departure from B&L. Former B&L employees Donnelly and Benson tendered their resignations to plaintiff and joined T&T Corporation from the first day of its operation.

On January 7, 1994, Thomas and Thorngren met with representatives of The Krystal Company ("Krystal") to discuss terms of a contractual arrangement whereby T&T Corporation would provide Krystal with TJTC program services. Plaintiff contends that Krystal was bound by an existing "TJTC Service Agreement" and an unemployment cost control contract with B&L at the time of defendants' solicitation.[4] By letter dated January 12, 1994, Krystal terminated its "TJTC Service Agreement" with B&L as of March 13, 1994. Several months later, in a letter dated June 24, 1994, Krystal cancelled its unemployment cost control agreement with B&L, effective June 30, 1994.

B&L filed an initial complaint in this matter on January 26, 1994, alleging defendants' violation of their individual covenants not to compete, breach of fiduciary duty, conversion, unfair competition, and unjust enrichment. On August 4, 1994, the trial court granted summary judgment in favor of Thorngren on all claims. B&L appealed.

On appeal, the Tennessee Court of Appeals, Middle Section, affirmed the trial court's grant of summary judgment as to B&L's claims for conversion of intangible property and breach of the covenant not to compete. *B&L Corp. v. Thomas & Thorngren, Inc.*, 917 S.W.2d 674 (Tenn. Ct. App. 1995) (hereinafter referenced as "*B&L I*"). The court reversed the trial court's grant of summary judgment as to B&L's claims for breach of fiduciary duty, conversion of tangible property including missing computer tapes and client lists, unfair competition, and unjust enrichment, and remanded the cause "to the trial court for further proceedings consistent with this opinion." *Id*. at 681. The Tennessee Supreme Court denied B&L's application for permission to appeal on February 26, 1996.

---

[4] Defendants contend that Krystal followed Thorngren to B&L from Thorngren's former employer, Reed Roberts.

-4-

While Thorngren's case was pending, Thomas filed a Motion for Summary Judgment individually, and on behalf of T&T Corporation. On February 10, 1995, the trial court entered an order granting summary judgment in favor of Thomas and T&T Corporation on all claims, and B&L appealed. In **B&L Corp. v. Thomas**, No. 01-A-01-9506-CH00274, 1996 WL 518079 (Tenn. Ct. App. Sept. 13, 1996) (hereinafter referenced as "**B&L II**"), the Middle Section determined that Thomas's employment contract expired on January 9, 1983, while his non-compete agreement expired two years later on January 9, 1985. *Id.* at *3. In reliance upon their decision in **B&L I**, the court applied "the same holdings to the Thomas appeal as we did in Thorngren['s] appeal" on the issues of breach of fiduciary duty, conversion, tortious interference with a contract, unfair competition, and unjust enrichment. *Id.* at *4. With regard to T&T Corporation, the court noted that B&L alleged two causes against the corporation: "procurement of breach of contract and unjust enrichment." *Id.* In examining B&L's claims against T&T Corporation, the court noted:

> [T&T Corporation] does not have a fiduciary relationship with B&L, and thus owe them no duty. However, we leave open the question of whether [T&T Corporation] has been unjustly enriched or whether it has procured the breach of B&L's contracts. Therefore, we reverse the chancery court and remand this issue for trial.
>
> We note that in the Thorngren appeal we held that we would not recognize a claim for the conversion of intangible property. Nevertheless in its brief B&L states that Mr. Thomas "has converted the business good will which [B&L] has developed with several of its clients." We maintain that there is no authority in Tennessee for a claim of conversion of intangible property. Thus we affirm the chancery court to the extent it granted Mr. Thomas' motion for summary judgment as to the conversion of intangible property.

*Id*.

On or about February 16, 1999, B&L filed a Notice of Voluntary Dismissal in the trial court voluntarily dismissing "the remaining claims pending in the Chancery Court Part I for Nashville, Davidson County, Tennessee." On February 22, 1999, the trial court entered an Order of Dismissal, stating in full:

> It appearing to the Court as evidenced by the Notice of Voluntary Dismissal filed on behalf of the Plaintiff, B&L Corporation d/b/a U.C. Consultants, that the remaining action in this matter shall be dismissed without prejudice and that the

remaining costs of this cause are taxed to the Plaintiff, B&L Corporation d/b/a U.C. Consultants.

It is **THEREFORE, ORDERED, ADJUDGED AND DECREED** that the above styled claims which are remaining in this case are hereby dismissed without prejudice and the remaining costs of this cause are taxed to the Plaintiff, B&L Corporation d/b/a U.C. Consultants.

On July 1, 1999, B&L filed a second complaint against defendants asserting breach of fiduciary duty, conversion, inducement to breach contract, unfair competition, and unjust enrichment. Plaintiff's first claim for breach of fiduciary duty alleged:

The individual Defendants breached their fiduciary duty by acting or failing to act as follows: (i) failed to advise [B&L] of their secret attempts to take over the business; (ii) individually failed to advise [B&L] of the other Defendant's intent to quit and form a new firm, Defendant Thomas and Thorngren, Inc.; (iii) disclosed confidential information to their competing new firm; (iv) compromised trade secrets and proprietary and confidential information of [B&L]; (v) generally subordinated the interest of [B&L] to their own interest in violation of their fiduciary duty to Plaintiff; and (vi) solicited clients/customers of [B&L] or advised clients/customers of their imminent departure from [B&L] and advised that they would be setting up their own competing firm.

As a direct and proximate result of the breach of the individual Defendants' fiduciary duty, Plaintiff suffered disruption of its business, lost valuable services of experienced employees, and incurred expenses associated with hiring and training new employees and other employees on an emergency basis, and otherwise. Additionally, [B&L] was substantially harmed because of the compromise of its confidential information and by the individual Defendants contacting [B&L's] valued clients/customers on their own behalf in an attempt to solicit accounts away from [B&L]. Defendants knowingly and willfully engaged in the actions described above.

T&T Corporation was not included as a defendant to B&L's breach of fiduciary duty action.

Plaintiff's conversion claim alleged that defendants removed B&L's "personal property" from the premises, including "supplies, lists, and other papers and documents." The third count set forth in the complaint, inducement to breach a contract, alleged that defendants Thomas,

Thorngren, and T&T Corporation violated T.C.A. § 47-50-109 in unlawfully procuring "the termination and breach of employment agreements" of former B&L employees Benson and Donnelly, and by knowingly inducing and procuring B&L clients and customers to breach contracts or agreements with B&L.

Plaintiff's fourth claim for unfair competition was premised on the following alleged unlawful acts of defendants Thomas and Thorngren:

> The acts of the Defendants, in disregarding their covenants not to compete and in wrongfully competing with Plaintiff, together with breach of their duties of employment loyalty to Plaintiff, with the purpose and intent of harming, disrupting and interfering with Plaintiff's business in Tennessee and elsewhere, and the enticement, solicitation and inducement to breach lawful contracts of Plaintiff and the use of Plaintiff's personal property, trade secrets and business techniques all constitute unfair competition.
>
> As a direct and proximate result of Defendants' unlawful conduct in unjustifiably interfering with [B&L's] business relations with its customers and its individual employees including the Defendants, Benson and Donnelly, Plaintiff has suffered disruption of its business in Tennessee and elsewhere, has lost business, has lost the valuable services of employees, has incurred expenses associated with hiring and training new employees on an emergency basis, and otherwise. Further, Plaintiff has been significantly harmed by the compromise of its trade secrets, business techniques, business property, confidential information, and otherwise as set out herein.

B&L's fifth and final claim for unjust enrichment was premised on the following factual allegations:

> Plaintiff alleges that the Defendants' acts and omissions conferred upon Defendants a benefit and advantage of tremendous and incalculable value, without compensation to [B&L], and therefore Defendants were enriched unjustly, at the expense of [B&L]. Accordingly, [B&L] is entitled to damages because of unjust enrichment.

On the basis of defendants' alleged unlawful conduct, B&L sought compensatory and punitive damages as full recovery for injuries and losses suffered.

-7-

On September 14, 1999, defendants filed a Motion to Dismiss based on the doctrine of *res judicata*. On November 18, 1999, the trial court entered an order denying defendants' Motion to Dismiss, stating:

> This matter having come before the Court on Defendants' Motion to Dismiss based on Res Judicata, which has been treated and considered as a motion for summary judgment by this Court; the Court having fully considered the materials filed by the parties and the argument of counsel; the Court having conducted its own research; and the Court being of the opinion that this case may proceed because res judicata is not applicable to the present case, and that the Plaintiff has not improperly split a cause of action between two proceedings, and that there is no final order from which res judicata could arise to prevent the present lawsuit, IT IS HEREBY ORDERED:
>
> > 1. Defendants' Motion to Dismiss based on Res Judicata is denied; and
> >
> > 2. Defendants are ordered to answer the Complaint in this matter.

On December 17, 1999, Thomas, acting individually and on behalf of T&T Corporation, filed an Answer denying all allegations of wrongdoing and asserting *inter alia*, the affirmative defense of *res judicata*. Thomas's pleading further alleged that the covenant not to compete contained within his original employment agreement was no longer in force on January 4, 1994. That same day, Thorngren filed a separate answer denying the material allegations and relying upon affirmative defenses identical to those cited in his co-defendant's pleading.

Defendants next filed a motion asking the trial court to grant them an interlocutory Appeal by Permission, pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure, from the court's November 18, 1999 order denying their motion to dismiss. On February 9, 2000, the trial court entered an order granting defendants' motion for permission to appeal pursuant to Tenn. R. App. P. 9. In March 2000, the Tennessee Court of Appeals, Middle Section, entered an order denying defendants' application for interlocutory appeal.

On October 20, 2000, B&L filed a Motion for Partial Summary Judgment, asserting that "no genuine issue of material fact exists with regard to liability in connection" with B&L's breach of fiduciary duty, inducement to breach of contract, unfair competition, and unjust enrichment actions; but, the motion apparently was not acted upon.

A non-jury trial began on June 18, 2001, and was ultimately completed after an extended delay on March 13, 2002, when the court announced from the bench findings of fact and conclusions of law in favor of B&L as to all claims. On May 16, 2002, the court entered a Memorandum and Order setting forth its findings of fact and conclusions of law and clarifying its oral findings. The court's Order entered judgment in favor of B&L against all defendants on plaintiff's claims of conversion, inducement to breach contract, unfair competition, and unjust enrichment, and further found for B&L as to plaintiff's breach of fiduciary duty action against defendants Thomas and Thorngren. The court awarded B&L $1,437,585.10 in compensatory damages on plaintiff's breach of fiduciary duty, unfair competition, and unjust enrichment claims. The court held defendants Thomas and Thorngren jointly and severally liable for the damages awarded on all three claims, and held T&T Corporation jointly and severally liable for damages awarded on B&L's unfair competition and unjust enrichment claims. The court awarded B&L $70,440.19 in damages on its intentional inducement to breach a contract claim. The court did not award damages on B&L's conversion action, and further reserved "finalizing its award of damages pending oral argument on these matters raised by Plaintiff and Defendants...."

In addition to compensatory damages, the trial court awarded B&L punitive damages against both Thomas and Thorngren in the amount of $25,000.00 per defendant.

The court delayed a final ruling on B&L's claims pending oral arguments on the calculation of damages. By Final Order entered August 29, 2002, the court reaffirmed its prior award of damages except to modify its prior ruling by deleting the specific award of $70,440.19 for intentional inducement to breach a contract, noting that B&L was not entitled to a separate award for the Krystal TJTC contract where the value of this contract was used to determine compensatory damages in order to make plaintiff whole. On September 26, 2002, defendants filed a Notice of Appeal of the trial court's August 29, 2002 Order.

Appellants present the following issues for review, as stated in their brief:

1. Does the doctrine of *res judicata* bar this lawsuit given that, in its 1994 lawsuit against the same defendants on the same cause of action, [B&L] prosecuted two of its claims (breach of non-compete agreements and conversion of intangible property) to a judgment on the merits that this Court affirmed?

2. Did Tennessee law require that Kris Thorngren and Steve Thomas tell B&L before their employment ended on January 4, 1994 (a) that their personal lawyer had advised them that their employment/non-compete agreements with B&L had expired many years earlier; (b) that they planned to offer to buy those B&L shares Steve did not already own; or (c) that they were so concerned about

-9-

B&L's future that they were preparing to start their own business if that offer did not lead to a purchase agreement?

3.  Did Tennessee law prohibit Kris Thorngren and Steve Thomas from competing with B&L after their employment with B&L ended because (a) they could compete more easily given their knowledge about, and their relationships with, B&L's customers; or (b) they had hired two former B&L employees who decided to quit their jobs after B&L's president told them he had fired Kris and Steve?

4.  Did Tennessee law require that Kris Thorngren and Steve Thomas pay B&L for any knowledge they gained, skills they improved, or relationships they developed while working at B&L?

5.  Does the record support a finding that Kris Thorngren, Steve Thomas, and Thomas and Thorngren, Inc. (T&T) maliciously induced The Krystal Company to breach a contract with B&L in January 1994 when no court ever resolved the dispute between B&L and Krystal over the enforceability of that contract, and B&L answered an interrogatory in December 2000 by stating that it knew of no former customer that had breached its contract with B&L?

6.  Whether the trial court's award to B&L of $1,437,585.10, or 150% of B&L's alleged gross annual revenue from all former B&L customers that later hired T&T, was proper given that it (a) compensates B&L for "lost" contracts that (other than the Krystal contract) B&L concedes went to term and therefore were not breached; (b) ignores that many of the same customers at issue unsuccessfully urged B&L to bid for their business when their contracts with B&L expired, first hired T&T more than a year after [Thorngren and Thomas] left B&L, or left B&L for another provider before later hiring T&T; (c) is based upon B&L's gross revenues rather than upon B&L's net profits; and (d) uses a multiplier that is significantly higher than what B&L's own expert witness testified he paid previously for a portion of B&L's business?

7.  Should [Thorngren and Thomas] have to pay punitive damages because they consulted a lawyer to make sure their non-compete obligations had expired and that they otherwise complied with Tennessee law as they prepared to make their offer?

-10-

Since this case was tried by the court sitting without a jury, we review the case ***de novo*** upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. ***See*** Tenn. R. App. P. 13(d).

## I.

The first issue for consideration is whether B&L's July 1, 1999 complaint is barred as ***res judicata***.

To briefly recount the pertinent procedural facts in this case, we note that B&L filed its first action against defendants on January 26, 1994. B&L's Complaint alleged the following causes of action: violation of defendants' respective non-compete covenants, breach of fiduciary duty, inducement to breach contract, conversion of property, unfair competition, and unjust enrichment. Defendants filed a Motion for Summary Judgment as to all claims, and the trial court granted the motion on all claims on August 4, 1994.

The court of appeals affirmed the trial court's grant of summary judgment as to B&L's claims for violation of the non-compete covenants and conversion of intangible property, but reversed the trial court's ruling with regard to B&L's breach of fiduciary duty, unfair competition, unjust enrichment, and conversion of tangible property claims, and remanded for further proceedings consistent with its decision. The Tennessee Supreme Court denied B&L's application for permission to appeal February 26, 1996. On or about February 16, 1999, plaintiff filed a Notice of Voluntary Dismissal in the trial court, voluntarily dismissing "the remaining claims pending" in the chancery court and, on February 22, 1999, the trial court entered an Order of Dismissal without prejudice.

Approximately five months later, on July 1, 1999, B&L filed another complaint against the same defendants alleging claims of breach of fiduciary duty, conversion, inducement to breach contract, unfair competition, and unjust enrichment. There appears to be no dispute that the claims set forth in B&L's second complaint are identical to those dismissed without prejudice by the trial court in its February 22, 1999 order.

On September 14, 1999, defendants filed a Motion to Dismiss based on the doctrine of ***res judicata***. The trial court denied defendants' motion by an order entered November 18, 1999. After a non-jury trial, the trial court entered a judgment in favor of B&L on its claims for breach of fiduciary duty, conversion, intentional inducement to breach contract, unfair competition, and unjust enrichment.

Defendants assert:

In 1994, B&L filed a lawsuit asserting several claims and then prosecuted two of those claims to a judgment on the merits that [the Tennessee Court of Appeals] affirmed and that the Tennessee Supreme Court declined to review. In 1999, B&L dismissed all claims remaining in its first lawsuit, later hired new counsel, and then filed a second lawsuit, alleging the same set of facts and asserting the same "remaining" claims against the same defendants. This constitutes impermissible claims splitting. (citations omitted).

Defendants further contend that "the resolution of any one claim on the merits bars a later lawsuit against the same defendants based on the same set of alleged facts."

Tennessee Rule of Civil Procedure 41.01 provides a plaintiff with a right to enter a voluntary nonsuit, dismissing an action without prejudice. The rule states in pertinent part:

**Rule 41.01 Voluntary Dismissal – Effect Thereof**

(1) Subject to the provisions of Rule 23.05, Rule 23.06, or Rule 66 or of any statute, and except when a motion for summary judgment made by an adverse party is pending, the plaintiff shall have the right to take a voluntary nonsuit to dismiss an action without prejudice by filing a written notice of dismissal at any time before the trial of a cause and serving a copy of the notice upon all parties, and if a party has not already been served with a summons and complaint, the plaintiff shall also serve a copy of the complaint on that party; or by an oral notice of dismissal made in open court during the trial of a cause; or in jury trials at any time before the jury retires to consider its verdict and prior to the ruling of the court sustaining a motion for a directed verdict.

The Tennessee Savings Statute, codified in T.C.A. § 28-1-105, further permits a plaintiff to commence a new action where a court renders a decision that does not fully conclude the plaintiff's right of action:

(a) If the action is commenced within the time limited by a rule or statute of limitation, but the judgment or decree is rendered against the plaintiff upon any ground not concluding the plaintiff's right of action, or where the judgment or decree is rendered in favor of the plaintiff, and is arrested, or reversed on appeal, the plaintiff, or the plaintiff's representatives and privies, as the case may be, may, from time to time, commence a new action within one (1) year after the reversal or arrest. Actions originally commenced in general sessions court and subsequently recommenced pursuant to this section in circuit or chancery court shall not be subject to the

monetary jurisdictional limit originally imposed in the general sessions court.

(b) In the case of a contract which limits the time within which an action arising out of such contract must be brought, if such action is commenced within the time as limited by the contract but the judgment or decree is rendered against the plaintiff upon any ground not concluding the plaintiff's right of action, or where the judgment or decree is rendered in favor of the plaintiff, and is arrested, or reversed on appeal, the plaintiff, or the plaintiff's representatives or successors, as the case may be, may, from time to time, commence a new action within one (1) year after the nonsuit, dismissal without prejudice, reversal or arrest.

While we agree with defendants that splitting a cause of action is not permissible, we recognize that this court remanded the original action to the trial court for a trial on the merits. The refiling of the action after the voluntary dismissal was a refiling of the remanded case by mandate of this Court and, thus, was a continuation of the original suit. However, there is no splitting of a cause of action in this case and this issue is without merit.

## II.

We restate and address defendants' next issue as whether the trial court correctly determined that defendants acted in breach of their fiduciary duties as executive-level employees. In its findings and ruling from the bench on the final day of trial, the court determined:

In the fall of 1993, Mr. Thorngren submitted his financial statement to the bank officer. They approached an attorney to draft up a corporate charter, corporate resolutions, issuance of stock, all of which were properly filed on December 1st, 1993. In the late fall, Mr. Thorngren and Mr. Thomas approached two key employees of the plaintiff – Gwen Benson, the office manager, and Jean Donnelly, one of the supervisors and at that time supervisor of the unemployment compensation section.

They indicated to these two women that they were going to make an offer to purchase the business from Mr. Brodbine. They discussed their plans to do so. They discussed the salary that these women would have in the event the offer was not accepted.

During the two weeks preceding January 4th, 1994, many steps were taken to prepare an office space that had been leased by Thomas and Thorngren, in the name of Thomas and Thorngren, in

-13-

the fall of 1993. They had arranged for telephones to be installed at the premises. They had equipment that they had purchased, furniture, computers.

They had mentioned to three of the existing customers of the plaintiff their plans to make an offer to purchase the business from Mr. Brodbine. Those conversations occurred at various places. One conversation was at a lunch paid for by the corporation.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

When Mr. Thomas received his bonus on January 3rd, 1993, steps were taken to immediately approach Mr. Brodbine the next day. In midmorning, Mr. Thomas and Mr. Thorngren and Mr. Brodbine all met in Mr. Brodbine's office. What happened in that meeting is disputed. It is not disputed that it was a meeting of very short duration. It is not disputed that Mr. Thomas and Mr. Thorngren assert that they were fired. Whether they were fired or not is a fact that the Court has considered throughout hearing all this testimony.

Mr. Brodbine contends that he was surprised and that they had tendered their resignation. Mr. Brodbine was upset, by his own admission.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The proposed offer made to Mr. Brodbine was considered by him to be an insult. The Court finds that the offer was a pretext and that the purpose of that was to promote a termination. And, in essence, whether it was a resignation or whether it was a termination, the employment of Thomas and Thorngren ceased at that meeting. The Court credits the testimony of Mr. Brodbine as to what happened in that meeting.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Mr. Thorngren had a noncompete at one time during his employment with the company. He knew that there was certain information that was considered confidential. The same is true of Mr. Thomas. Those noncompetes expired by their own terms. However, each of these individuals as an officer had a high

-14-

fiduciary duty to the corporation to preserve the confidences of the corporation.

It is also correct that when they discussed their circumstances in the summer of 1993, each of them sought to determine whether their noncompetes were still valid. Each of them was led to believe that the noncompetes were not valid. Each of them had a duty, as with regards to the information of the other party, to convey that to the corporation. Mr. Thomas had a duty to convey that he had learned Mr. Thorngren's noncompete was no longer valid. It was of importance to the corporation that an individual with as much contact as Mr. Thorngren had with the customers should have a noncompete that was viable for the protection of the company. It was initially sought. It had expired. Mr. Brodbine was not aware. Mr. Thomas was aware. He did not bring it to the attention of Mr. Brodbine. Likewise, Mr. Thorngren learned that Mr. Thomas' noncompete had expired. He did not bring that to the attention of the corporation.

This is a duty that each of these individuals, as an officer of the corporation, had to the corporation. Their failure to disclose this was a breach of their fiduciary duty.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The Court concurs with counsel for the plaintiff that the financial statements – excuse me – the financial documents from First American National Bank, prepared by Frank Hammer, indicate that Mr. Thorngren and Mr. Thomas were actively preparing to compete against the corporation for which they were working in the fall of 1993.

Mr. Thorngren improperly discussed his proposal or his intention to purchase the company with the plaintiff corporation's customers in the fall of 1993. The Court considers those conversations not in a harmless fashion but in an effort to solicit the business when they left the corporation.

One of the most telling things, I think, about that conversation or those conversations was through the testimony of Ms. Donnelly, when asked if she had shared any of the information about leaving with any of the contacts she had – the customers that she had. And she said no; she had no reason to share that

-15-

information with any of the customers.  Likewise, neither did Mr. Thomas nor Mr. Thorngren have any reason to share with the customers that they were about to purchase or make an offer to purchase the company, except to ensure that the customer would come with them once they left.

Mr. Thorngren testified that he's not a rich man; that he did not want to be fired; that he needed to work.  He and Mr. Thomas took steps to ensure that they would not be lacking for work while they were still employed with the plaintiff corporation and structured their termination from the company in such a fashion that they were able to immediately go into business and compete with information that the Court has designated as confidential information.

The Court does not find credible the actions taken by the defendants to submit a letter to Mr. Brodbine with an offer to purchase the company was a good faith offer and finds that there is a lack of credibility with regards to their actions leading up to January 4th, 1993.  All other actions indicate that they understood and believed that at the time they made that offer to Mr. Brodbine they intended to leave the company.

The testimony of Ms. Benson and Ms. Donnelly talked about the enterprise as though it was a joint venture in their testimony – "when we were going to leave."  It is improper for corporate officers to approach key employees with the purpose of securing their services at the very day that they decide to leave the employment of the plaintiff corporation.

The Court finds that there has been serious breaches of the fiduciary duty owed by Mr. Thorngren and Mr. Thomas to the plaintiff corporation.

**************************************************

The Court concurs that the elements of unfair competition and unjust enrichment track the breach of the fiduciary relationship.

Tennessee encourages competition.  Noncompetes are not favored.  Tennessee also holds corporate officers to a high fiduciary duty.  Had one individual decided they were going to

leave, had they approached an attorney and set up a corporation, the law very clearly says that they're entitled to do that while they're still employed.

In this instance, though, the principles of the law have been twisted to submit a defense that says that the conduct engaged in by Thomas and Thorngren was permissible. This Court disagrees.

This is an instance in which key employees took advantage of the intimate knowledge not readily available to competitors and used it to go immediately into competition against their former employer, taking with them two key employees and shortly thereafter securing the former customers of their former employer, using unfairly the information that was critical to their former employer.

One of the reasons that was asked in the closings was, "Why would the defendants engage in such a charade? They wanted to make a serious offer." The Court does not engage in looking at the personalities of these individuals. I've looked at the finances of the corporate entity, the corporate plaintiff. The corporate plaintiff generated significant amounts of income despite the bonus structure and the salaries being earned for the services being rendered by the officers. The opportunity to take over such an entity generating such income constitutes a reason why one would engage in such a charade. Money has motivational powers. It has really nothing to do with personalities.

To briefly summarize the court's holding, we note that the trial court's judgment in favor of B&L on its breach of fiduciary duty action was premised upon the court's findings that (1) defendants failed to notify B&L that their non-compete agreements had expired and were no longer binding; (2) defendants failed to inform plaintiff of their respective co-defendant's intentions and actions to establish a competing business; (3) defendants improperly solicited B&L customers during the scope and course of their employment with plaintiff; (4) defendants improperly solicited the employment of B&L employees Benson and Donnelly while defendants were themselves still employees of plaintiff; and (5) defendants unlawfully utilized confidential business information gathered or learned during the scope and course of their employment with B&L to immediately enter into competition with plaintiff corporation upon their termination or resignation from B&L. We will examine each of these findings separately.

The Middle Section examined the scope of Thorngren's fiduciary duty in *B&L I*, stating:

Thorngren, a vice-president and officer of [B&L], owed his employer a fiduciary duty. Practically this meant that Thorngren could not "assume positions of conflict with the interests of the corporation." *Hayes v. Schweikart's Upholstering Co.*, 55 Tenn. App. 442, 402 S.W.2d 472, 483 (1985). Also, Tennessee law requires an officer to discharge his duties in "good faith, with the care of an ordinarily prudent person in a like position would exercise under similar circumstances in a manner he believes to be in the best interests of the corporation." T.C.A. § 48-58-403. Whether Thorngren breached his fiduciary duty requires a detailed examination of the facts and law, making summary judgment a potentially inappropriate device. This Court has held that whether an officer properly discharges his duties is a question of fact to be determined in each case in view of all the circumstances. *Fitch v. Midland Bank & Trust Co.*, 737 S.W.2d 785 (Tenn. Ct. App. 1987).

*B&L Corp. v. Thomas & Thorngren, Inc.*, 917 S.W.2d 674, 678-79 (Tenn. Ct. App. 1995).

The court acknowledged that an employee may prepare to compete with his or her employer prior to termination from or resignation of employment; however, the court further noted that an executive employee may not take action in wrongful competition with his or her employer.[5] *Id*. at 679. Finding no evidence in the record to preponderate against the trial court's finding that Thomas was also an executive officer of B&L, we conclude that he owed an identical fiduciary duty to that of Thorngren.

---

[5] The court's ruling suggests that defendants' actions of leasing office space, arranging for telephone service, and acquiring office furniture and equipment prior to their termination or resignation from B&L did not constitute a breach of their respective fiduciary duties to plaintiff corporation. In *Venture Express, Inc. v. Zilly*, 973 S.W.2d 602 (Tenn. Ct. App. 1998), this Court reiterated this finding of law, stating:

> We reject Venture Express's contention that Zilly's act of filing a corporate charter for Zilly Transportation Services while still employed by Venture Express constituted a breach of Zilly's fiduciary duty. *See B&L Corp. v. Thomas & Thorngren, Inc.*, 917 S.W.2d 674, 679 (Tenn. Ct. App. 1995) (noting that corporate officer may prepare to compete prior to his termination from corporation); *accord Bancroft-Whitney Co. v. Glen*, 64 Cal.2d 327, 49 Cal. Rptr. 825, 411 P.2d 921, 935 (1966) (mere fact that officer makes preparations to compete before he resigns his office is not sufficient to constitute breach of duty); *Parsons Mobile Prods., Inc. v. Remmert*, 216 Kan. 256, 531 P.2d 428, 432 (1975) (even before termination corporate director or officer is entitled to make arrangements to compete).

*Id*. at 606 n. 2.

We preface our analysis of the court's breach of fiduciary findings by stating that, in light of the Middle Section's holdings in **B&L I,** a finding that defendants acted in breach of their respective fiduciary duties may only be premised upon actions taken by defendants while still employed as executive officers of B&L. On appeal, the Middle Section held that Thorngren's employment agreement with B&L "expired by its own terms no later than July 8, 1986." 917 S.W.2d at 678. This expiration date included or accounted for Thorngren's three-year non-competition agreement. Thomas's employment agreement was for a term of one year, commencing on January 9, 1982. Thomas's agreement included a two-year non-competition agreement essentially identical to the one contained in Thorngren's contract. In **B&L Corp. v. Thomas**, No. 01-A-01-9506-CH00274, 1996 WL 518079, at *3 (Tenn. Ct. App. Sept. 13, 1996), the court held that Thomas's employment agreement expired on January 9, 1983, and his non-compete agreement two years later on January 9, 1985.

We begin with the question of whether defendants' failure to notify B&L that their non-compete agreements had expired and were no longer binding constituted a breach of their individual fiduciary duties. We find that such failure did not constitute a breach of defendants' fiduciary duties. There is no dispute that B&L, as defendants' employer, was aware of the terms of the non-compete clauses contained within the respective employment agreements. In fact, B&L drafted or ordered one of its officers to draft these agreements. B&L is thus charged with knowledge of these non-compete agreements and the terms of their expiration, and can not be heard to argue that it was defendants' responsibility to notify plaintiff corporation of the fact that the non-compete agreements had expired. We therefore hold that the trial court erred in premising its finding that defendants breached their individual fiduciary duties on grounds that they failed to notify B&L of their expired non-compete agreements.

We next address the court's finding that defendants' failure to inform plaintiff of their respective co-defendant's intentions and actions to establish a competing business constituted a breach of their individual fiduciary duties. As executive officers of B&L, defendants were entrusted with information and responsibilities not permitted of regular employees. Based upon their position as executive employees, the trial court found that defendants "each willfully violated his independent fiduciary duty to Plaintiff by not disclosing to Plaintiff that the other individual Defendant was actively taking steps to establish a competing business while employed by Plaintiff, and by continuing to accept salary and bonuses from Plaintiff after the initial failure to disclose the information related to each other's non-competition agreements."

The undisputed evidence in this case is that two of B&L's highest-ranking officers conspired for several months to establish a competing business without the knowledge of their employer. Defendants conspired with the knowledge that the non-compete agreements signed at the onset of their employment with B&L were no longer valid and thus had no restrictive effect on their ability to compete with plaintiff corporation. The record further indicates that both Thomas and Thorngren had access to valued customer information, were relied upon heavily for the continued success of B&L's business, and that their resignation or termination severely

threatened B&L's immediate ability to conduct business. President Brodbine testified as to the confusion that followed defendants' departure:

> Q. I'd also like you to describe for me in a little more detail what sort of problems you were having with the computer system after these four individuals left the company.
>
> A. Well, no one knew certain passwords that only Jean knew.
>
> Q. Do you mean Jean?
>
> A. Donnelly – Gwen Benson. I apologize. Gwen Benson.
>
> Plus the employees were confused. At the same time, I was running back and forth to Jacobs' office to get an injunction placed against these individuals, and we were working on that.
>
> There was no solicitation going on to clients. I had no one, really, that was capable of going out and visiting clients, to give them reports, with the exception of Glen [McCall]. John Lewis was another one, but I had to let him go.

While we recognize that defendants were entitled to make certain preparations toward the establishment of a competing business, including the leasing of office space, equipment, and furniture, and the connection of necessary utilities, it is our conclusion, on the basis of the above cited evidence, that the loss of two high ranking officers had an immediate and debilitating effect on B&L's ability to operate and function effectively. We further find that Thomas and Thorngren, as officers, had a duty to act in good faith, with the best interests of the corporation in mind, and are thus simply unable to conclude that defendants' covert scheme to establish a competing business was in the best interests of B&L.

Moreover, we afford significant weight to the trial court's finding that defendants' offer to purchase B&L was mere pretext, submitted for the purpose of facilitating their termination from plaintiff corporation. When the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. Sp. Workers Comp. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Id.*; *In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

The evidence in the record supports the trial court's finding that defendants entered into a calculated scheme to compete with their former employer. On January 4, 1994, defendants entered Brodbine's office with the knowledge that their non-compete agreements had expired, and with a plan in place to begin a business in immediate competition with B&L. At the time of the meeting, defendants had secured a physical base of operation for their business, furnished with the equipment and utilities necessary to begin immediate operation. Defendants had commitments from employees Benson and Donnelly, and had already removed their personal belongings from plaintiff's building. All of these arrangements were made and actions taken without B&L's knowledge. It is apparent from this evidence that defendants only intention was to sever ties with B&L and immediately begin competition for clients.

Moreover, by facilitating their immediate and unexpected departure from B&L, and with no non-compete agreement in place to restrict their actions, defendants created a window of opportunity in which they could capitalize on B&L's confusion and weakened state and utilize their contacts and customer knowledge to solicit plaintiff's clients. The evidence in the record indicates that defendants contacted several B&L customers in the month following their departure, and soon thereafter entered into TJTC and/or unemployment cost control contracts with several of these customers.

We thus affirm the trial court's holding that defendants acted in breach of their fiduciary duties as executive officers in failing to notify B&L of their respective co-defendant's intent to establish a competing business. While this finding alone is sufficient to affirm the trial court's ruling, we note that the trial court was further correct in holding that defendants breached their fiduciary duties by soliciting the employment of B&L employees Benson and Donnelly. Defendants contend that they urged Benson and Donnelly to remain with B&L, but extended offers of employment with T&T Corporation to both employees in or around October 1993. Thorngren testified that he offered both Benson and Donnelly an annual salary of $30,000.00. Defendants did not mention these offers to Brodbine.

In *Knott's v. Azbell*, No. 01A-01-9510-CH-00459, 1996 WL 697943 (Tenn. Ct. App. Dec. 6, 1996), this Court stated:

> After the termination of his agency, in the absence of a restrictive agreement, the agent can properly compete with his principal as to matters for which he has been employed.... Even before the termination of the agency, he is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein. Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete. *He is not, however, entitled to solicit customers for such rival business before the end of his*

-21-

> *employment nor can he properly do other similar acts in direct*
> *competition with the employer's business.*

*Id*. at \*4 (quoting Restatement (Second) of Agency § 393 cmt. e (emphasis added)).

Under the particular circumstances of this case, we find defendants' solicitation of two of B&L's key employees akin to the improper solicitation of employer clients during the scope and course of employment. The evidence in the record indicates that Benson and Donnelly held positions of importance and responsibility with B&L. Benson testified that her job responsibilities included auditing benefit charges and "doing claims." Donnelly testified that she was originally hired by Brodbine to serve as the supervisor of the corporation's TJTC program. Donnelly was eventually asked to oversee the corporation's Department of Unemployment Compensation as well. As supervisor of these departments, Donnelly had direct contact with B&L customers.

In light of Benson and Donnelly's testimony as to their duties at B&L, we find that defendants had a fiduciary duty to refrain from soliciting the employment of two of plaintiff's most valued employees. Defendants' solicitation of these employees can only be seen as an attempt to secure the services of two valued and experienced employees for their competing venture. Defendants' solicitation and subsequent hiring of Benson and Donnelly led to the foreseeable result of hamstringing B&L's ability to continue functioning at an optimum level. We therefore find that the trial court properly premised its finding that defendants breached their duties of loyalty to B&L upon defendants' wrongful solicitation of employees Benson and Donnelly prior to their termination or resignation from B&L.

In the interest of providing a complete and thorough analysis of the issues raised by defendants on appeal, we now address the two additional grounds cited by the trial court in support of its finding that defendants breached their individual fiduciary duties to B&L. We address first the trial court's finding that defendants breached their fiduciary duties by improperly soliciting the business of B&L customers while still employees of plaintiff corporation.

Defendant Thorngren testified that he spoke to three separate B&L customers, American Health Centers, Fred's, and NationsBank, about defendants' plan to make an offer to purchase B&L from Brodbine, prior to January 4, 1994. Thorngren maintained that he never solicited the business of these companies on behalf of T&T Corporation, but merely notified these clients of defendants' future plans. Thorngren noted that he signed no contract for services on behalf of T&T Corporation prior to his termination or resignation from B&L, and further maintained that he "had no agenda in mentioning [defendants' plan to make an offer] to anybody."[6]

---

[6] On cross examination, appellee counsel asked Thorngren whether he had discussed the possibility of making an offer to buy B&L with Krystal prior to his termination or resignation from plaintiff corporation. Thorngren stated:

> Q. Do you specifically recall whether you did or did not discuss this topic with

(continued...)

Thomas, likewise, admitted to telling representatives from Life Care Centers and Southwest Airlines of defendants' plan to submit an offer to buy B&L or, in the alternative, begin a competing business. Both Thomas and Thorngren admitted to explicitly soliciting business from B&L clients after their termination or resignation from plaintiff corporation.

In ***Knott's v. Azbell***, No. 01A-01-9510-CH-00459, 1996 WL 697943 (Tenn. Ct. App. Dec. 6, 1996), the trial court held, ***inter alia***, that former employee Azbell breached his fiduciary duty of loyalty to plaintiff employer by wrongfully soliciting plaintiff's customers during the scope of his employment. ***Id***. at *2. Addressing defendant's issue of whether the trial court erred in finding that he breached his duty of loyalty to employer, and specifically the question of whether Azbell's conduct amounted to active solicitation of plaintiff's customers, this Court noted that Azbell was an at-will employee, not bound by a non-competition agreement. ***Id***. at *3. Recognizing that an employee is entitled to make arrangements to establish a business in competition with his current employer, but may not solicit his employer's customers prior to his termination or resignation from employment, we held that Azbell's actions amounted to an improper solicitation of his employer's customers:

> In this case, Azbell admits that he told customers, "I'm going to be going into business for myself here in a couple of weeks and I would appreciate you doing some business with me." Azbell states that "I just told some of the customers that I was going to be leaving Knott's and when I came back in a week or so, I would be in business for myself and I would appreciate them buying from me." He admits, "[Y]es, I did ask for their business." Moreover, he assured the customers that he would provide the same products as Knott's at the same prices.

---

[6](...continued)
anybody at The Krystal Corporation?

A. When I first gave a deposition, I thought I might have talked to Terry Matthews at Krystal Company, because I had gone through Chattanooga not long before January 4, but – and so I mentioned that because it was a possibility that I had talked to Terry. But it turned out I had not.

Q. What happened after your April 1994 deposition that made you sure you had not talked to him about it?

A. At some point somebody talked with Terry Matthews, and he didn't recall any conversation like that.

Azbell's conversations with customers went beyond merely notifying Knott's customers of his intentions or posing "brief, non-specific, strictly hypothetical" queries. He asked for their business and even assured them he could supply the same products at the same prices as Knott's. This is active solicitation. Azbell's conduct was a breach of his fiduciary duty to his employer to refrain from actions adverse to the employer's interests and, in particular, the duty not to compete with the employer during the employment relationship, even in the absence of a noncompetition agreement.

*Id*. at *5 (citations omitted).

In ***Baker v. Battershell***, 1986 WL 7602 (Tenn. Ct. App. July 9, 1986), this Court again considered, ***inter alia***, the question of whether a former employee (Battershell) improperly solicited business from employer's (Baker) customers while still an employee. We cited the testimony of two separate customers supporting Battershell's contention that she did not improperly solicit their business while still an employee of Baker:

One testified that [Battershell] discussed her plans [to purchase Baker's agency or start a competing business] with him and her reasons for these plans (i.e., security for herself and her child) and that she did not attempt to solicit his business. The other client testified that Battershell also discussed her plans and the reasons for those plans with her. She testified that Battershell asked if she would do business with her but that Battershell did not ask her to follow her, but rather simply asked how the client felt about the move, and the client stated that she gave her approval.

*Id*. at *1.

Finding no evidence to preponderate against the trial court's finding that Battershell did not improperly solicit the business of plaintiff's clients while still an employee of plaintiff's agency, we held:

The evidence in the present case shows that the defendants merely notified the customers as to their intentions. They did not actively try to undercut the plaintiff's business by offering lower prices or making promises or offers. The did not deceive the customers. The evidence shows that they attempted to protect the customer's interests by getting early delivery of cruise documents. There is no evidence that the defendants solicited or received any profits for their new employment from these cruises. We cannot

-24-

> say that the evidence preponderates against the trial court's finding that the defendants did not actively solicit plaintiff's clients or that as a matter of law that they engaged in a conspiracy to divert plaintiff's business.

*Id*. at \*5.

In the present case, we find no testimony or evidence in the record to indicate that either Thomas or Thorngren improperly solicited the business of B&L's customers while still officers of the corporation. Defendants admit that they notified various customers of their intentions to make an offer to purchase B&L from Brodbine or, in the event said offer was rejected, start a competing business. However, the record is devoid of any evidence to suggest that the defendants explicitly requested the business of B&L's existing customers or actively tried to undercut B&L's business by offering lower prices, or making promises or offers for services. We therefore hold that the trial court erred in finding that the defendants improperly solicited business from B&L's customers in violation of their individual fiduciary duties.

The trial court further premised its ruling that the defendants breached their individual fiduciary duties to B&L upon its finding that they failed to "preserve the confidences of the corporation." The court specifically identified four categories of "confidential business information" that the defendants unlawfully used to compete against B&L – the names of B&L customers, the prices B&L charged for services rendered, the renewal dates for customer contracts, and the name of the customer contact person authorized to enter into binding contracts for TJTC or unemployment cost control services.

In examining the confidential nature of this information, the trial court considered and relied upon the factors identified in ***Venture Express, Inc. v. Zilly***, 973 S.W.2d 602 (Tenn. Ct. App. 1998), wherein this Court noted:

> This court previously has held that "confidential business information is akin to trade secrets," which consist of "any formula, process, pattern, device or compilation of information that is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not use it." ***Heyer-Jordan & Assocs. v. Jordan***, 801 S.W.2d 81, 821 (Tenn. Ct. App. 1990) (quoting ***Hickory Specialties v. B&L Labs, Inc.***, 592 S.W.2d 583, 586-87 (Tenn. Ct. App. 1979)). Information cannot constitute a trade secret and, thus, is not confidential if the subject matter is "of public knowledge or general knowledge in the industry" or if the matter consists of "ideas which are well known or easily ascertainable." ***Id***.

In the absence of evidence to the contrary, this court has held that the following types of information are not confidential:

> (1) Remembered information as to a business's prices;
>
> (2) The specific needs and business habits of certain customers; and
>
> (3) An employee's personality and the relationships which he has established with certain customers.
>
> *Data Processing v. Martin*, 1987 WL 30155, at *6 (Tenn. Ct. App. Dec. 30, 1985); *Stangenberg v. Allied Distr. and Bldg. Serv. Co.*, 1986 WL 7618, at *7 (Tenn. Ct. App. July 9, 1986).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

In *Stangenberg v. Allied Distr. and Bldg. Serv. Co.*, 1986 WL 7618 (Tenn. Ct. App. July 9, 1986), this court listed some factors to be considered in determining whether certain information constitutes a business's trade secret:

> (1) the extent to which the information is known outside of [the] business;
>
> (2) the extent to which it is known by employees and others involved in [the] business;
>
> (3) the extent of measures taken by [the business] to guard the secrecy of the information;
>
> (4) the value of the information to [the business] and to [its] competitors;
>
> (5) the amount of money or effort expended by [the business] in developing the information;
>
> (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id*. at 606.

Applying each of the six factors cited above, the trial court found that the names and identities of B&L customers, and the prices charged for services rendered, were confidential information. The court recognized that B&L customers were not bound by confidentiality agreements, and at times chose to reveal their business relationship with plaintiff corporation. With regard to the prices charged for services rendered, the court found:

> [Prices, unlike customer names, were] not as easily determined by anyone outside of the company, and it was not easily determined by those within the company, except individuals who had reason to know, which would have been the two billing people and the salespeople – who happened to be the two officers involved, Mr. Brodbine, and one other salesperson, to the best of my knowledge.

The court noted that the customer could willingly disclose the prices to competitors.

The court was further persuaded in its conclusion that B&L's customer information was confidential in nature by the extensive security measures employed by B&L to ensure the safety and confidentiality of this information. The evidence indicates that B&L installed a computer password system that assigned the level of access to client information permitted to each individual employee. Employees were prohibited from sharing passwords. Few employees had access to all of the client information identified by the court as confidential. Information regarding customer contract renewal dates and client representatives could not be accessed through the computer system, but could be found on the original customer contracts and the copies made thereof. The court appears to suggest that these contracts and copies were not readily accessible to all employees. The court noted that Thomas, Thorngren, Benson, and Donnelly, together, had access to all of this information.

With regard to the final three factors, the court found that this client information had significant value to B&L and its competitors, required a great deal of money and effort to develop, and was difficult to obtain. The court noted:

> We have people who had access to that information, who could pick off the customers of the plaintiff corporation without having to expend the resources necessary to determine which companies wanted the service, which companies didn't want the service, which companies were willing to pay X-amount for the service versus how much another company might be willing to pay. They knew the individual who they could readily approach. That

might have been information that they learned while working for the company, and it might be information that they could take with them, but the Court is looking at the totality of the circumstances.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The last element is ease or difficulty with which the information could be properly acquired or duplicated by others. The evidence demonstrates that there is a large, extremely large, pool of potential customers. I think Mr. Thorngren's testimony was that they were dealing with over 500 in this area of potential customers.

Mr. Brodbine's testimony is that cold calls are very ineffective, referrals help from satisfied customers. It takes a lot of time and effort, according to Mr. Brodbine, to be able to make the initial and proper contact to secure a binding commitment from a client. That testimony was corroborated by Mr. Thomason. Mr. Thomas and Mr. Thorngren had great ease, because they had acquired the information. And whether it was duplicated because they had it in their heads, they improperly used it, and it's confidential information. They did not have the difficulty of setting up a business and growing it over a period of time. They were able to set up a business and to secure clients almost immediately, those being the clients of the plaintiff corporation.

Counsel for the plaintiff corporation is correct that the calendars maintained in the late part of – excuse me – in the early part of January through June of 1994 reflect the same contacts that were made in the late fall of '93. There was a high percentage of similarities between the calls on the plaintiff corporation's customers both before and after January 4, 1994.

Upon our review of the record, we find that the evidence preponderates against the trial court's finding that B&L's customer information, specifically, client names, prices charged for services rendered, customer contract renewal dates, and the identity of client representatives, constituted confidential business information.

Considering first the confidential nature of B&L's individual customers, we cite to Brodbine's cross examination testimony as evidence that the names of potential customers are available to experienced competitors through various sources:

Q. Now, if I wanted to find out the potential customers to call on in either the healthcare or the restaurant field, there's a variety of ways I could determine who those potential customers are; correct?

A. Of course. Yes.

Q. One thing I could do is simply go to the Yellow Pages of the phone book and look for healthcare, under "hospitals," and determine all the hospitals, could I not?

A. You could, but you'd be making a big mistake.

Q. All right. But I could do it that way, couldn't I?

A. You could, but you would be spinning your wheels.

Q. But I could do it; right?

A. You could.

Q. Now, if I chose to do it that way, I would be able to identify the customers in the healthcare field that were under the heading of "hospitals" that I might want to call on; right?

A. No.

Q. Well, why couldn't I, sir?

A. Because most hospitals belong to a large corporate – a corporation – a large corporation. And if you went to the Yellow Pages, certain hospitals you don't know whether it belongs to a major corporation, whether it's a reimbursable, whether it's a member of an association. You just can't tell by going to the Yellow Pages.

Q. But there are some that I could find that way, couldn't I?

A. Well, you could do that if you wanted to?

Q. Now, to find those that are a member of an affiliation, as you described, I could then go to the American Hospital Association and ask for a list of all of its members, could I not?

A. You could.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q. So I could have found out simply by going to the Yellow Pages in the phone book or to the industry trade associations or buying the list; correct?

A. Well, you could find out. But I tried it, and it didn't work.

Q. But I could find it out, because it's publicly available information, is it not?

A. Well, it's in writing. It's available. But to get – but it's a waste of time doing it that way.

Q. But if I took the time to do it, you agree with me I could obtain it from that publicly available information?

A. And you would have a nighttime job washing dishes, because you wouldn't get anybody that way.

Q. And by that, you mean it might take me more time to find it out; correct?

A. Of course.

Q. Now, if I spent the time to find it out from publicly available information, if then I wanted to contact one of those companies, all I would have to do is find out their telephone number; correct?

A. You could call 'em, yes.

Q. Let me go back one step, if I could. And I apologize for this.

You, in fact, have bought lists of potential customers, have you not, according to what Mr. McCall testified?

A. Yes.

Accepting as true Brodbine's testimony that reliance upon the Yellow Pages is not the most efficient or successful method of identifying potential clients, we are still unable to find that

-30-

the names of B&L's clients was confidential information.  Brodbine's testimony reveals that the information was available to the public.  Moreover, there was additional testimony at trial indicating that customers have on occasion been willing to reveal themselves upon request to do so.  We note that B&L's customers did not have a confidentiality agreement prohibiting them from disclosing their business relationship with plaintiff corporation.  For these reasons, we find that the names of B&L's customers do not constitute confidential business information.

With regard to the prices charged by B&L for services rendered, we reiterate that B&L's clients were not bound by a confidentiality agreement prohibiting them from disclosing the prices that they paid pursuant to their agreement with plaintiff corporation.  In *Venture Express*, this Court held that the customer rates charged by plaintiff were not confidential information, relying, in part, on the following factual finding:

> Although Venture Express prohibited its officers and employees from revealing customer rates, it apparently imposed no similar prohibition on either its customers or its independent owner-operators.  In fact, prior to trial, one of Venture Express's customers, Huntco Steel, Inc., faxed material to Zilly which contained rates charged by its various carriers, including Venture Express.

973 S.W.2d at 607.

Moreover, there is evidence in the record to indicate that customers have been willing to disclose the prices charged when asked.  For these reasons, we find that the prices charged by B&L to its customers are not confidential business information, regardless of the confirmed irregular nature of the prices and the fact that few employees were privy to this information.

Addressing next the question of whether B&L's contract renewal dates and client representative identities were confidential information, we note that there is evidence in the record to indicate that this is information that could be learned once an experienced individual identified a potential client.  As stated, B&L's clients were not prohibited from discussing the terms of their services contract with potential suitors.  While we recognize that efforts to retrieve this information through cold calls can be difficult, time consuming, and often unfruitful, we are unable to conclude that this information is confidential simply because it can be difficult to obtain.

In summary, we find that the trial court erred in awarding a judgment in favor of B&L as to its breach of fiduciary duty claim on grounds that defendants unlawfully solicited plaintiff's customers while officers of B&L, and that defendants unlawfully used or relied upon confidential business information in soliciting B&L clients after their resignation or termination on January 4, 1994.  However, we affirm the trial court's finding in favor of B&L as to plaintiff's claim for breach of fiduciary duty for the reasons already stated.

In any event, we must recognize that the defendants were not bound by a noncompete agreement and were free to enter the market place in competition with B&L. In ***Venture Express, Inc. v. Zilly,*** 973 S.W.2d 602 (Tenn. Ct. App. 1998), this Court said:

> In the absence of evidence to the contrary, this court has held that the following types of information are not confidential:
> (1)     Remembered information as to a business's prices;
> (2)     The specific needs and business habits of certain customers; and
> (3)     An employee's personality and the relationships which he has established with certain customers. Data Processing Equip. Corp.v. Martin, 1987 WL 30155, at *6 (Tenn. App. Dec. 30, 1987); Stangenberg v. Allied Distr. & Bldg. Serv. Co., 1986 WL 7618, at *7 (Tenn. App. July 9, 1986).

***Id.*** at 606.

In competition with B&L, defendants were not required to erase from their minds the elements set out in ***Venture Express, Inc.***, and to a large extent, the trial court's ruling required just that.

## III.

We restate defendants' third issue as whether the trial court erred in entering a judgment in favor of B&L as to its unfair competition claim. In its complaint, B&L premised its unfair competition claim on the following allegations:

> The acts of the Defendants, in disregarding their covenants not to compete and in wrongfully competing with Plaintiff, together with breach of their duties of employment loyalty to Plaintiff, with the purpose and intent of harming, disrupting and interfering with Plaintiff's business in Tennessee and elsewhere, and the enticement, solicitation and inducement to breach lawful contracts of Plaintiff and the use of Plaintiff's personal property, trade secrets and business techniques all constitute unfair competition.

In ***B&L I***, the Middle Section stated:

> Unfair Competition is a generic name for several related torts involving improper interference with business prospects. Prosser and Keeton on the Law of Torts § 130 at 1013 (5th ed. 1984). Although all unfair competition does not stem from a

-32-

breach of fiduciary duty relationship, the breach of a fiduciary relationship by an employee, using confidential information obtained while employed to the detriment of his employer, may constitute unfair competition. ***Plastic Industries, Inc. v. Yarborough and Co.***, 1988 Tenn. App. LEXIS 742, C.A. No. 57, CIV. ACTION NO. 16, 108.

For many of the reasons already discussed in the fiduciary duty portion of this opinion we believe there to be a genuine issue of material fact regarding Thorngren's actions and remand this issue for greater examination.

917 S.W.2d at 681.[7]

---

[7] In ***Dade Int'l, Inc. v. Iverson***, 9 F. Supp.2d 858 (M.D. Tenn. 1998), the court stated:

In its most common form, the tort of unfair competition requires a showing that:

(1) the defendant engaged in conduct which 'passed off' its organization or services as that of the plaintiff; (2) in engaging in such conduct, the defendant acted with an intent to deceive the public as to the source of services offered or authority of its organization; and (3) the public was actually confused or deceived as to the source of the services offered or the authority of its organization.

***Sovereign Order of St. John v. Grady***, 119 F.3d 1236, 1243 (6th Cir. 1997). This tort is generally alleged as part of a trademark infringement case. (citations omitted).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The Tennessee Court of Appeals has considered it appropriate to extend the tort of unfair competition beyond the context of trademark infringement in certain circumstances. In ***B&L Corp. v. Thomas & Thorngren, Inc.***, 917 S.W.2d 674 (Tenn. Ct. App. 1995), for instance, the court held that an action for unfair competition could be sustained for a breach of a fiduciary relationship by an employee who uses confidential information to the employer's detriment. ***Id***. at 681. In so doing, the court noted that "[u]nfair competition is a generic name for several related torts involving improper interference with business prospects." ***Id***. (citing Prosser and Keeton on the Law of Torts § 130 at 1013 (5th ed. 1984)).

*Id*. at 861-62.

Prosser and Keeton on the Law of Torts § 130 at 1013 (5th ed. 1984), relied upon heavily by the court in ***B&L I***, states in pertinent part:

> Quite apart from any improper motive, unfair competition, or for that matter other interferences with prospects, can be found when the defendant engages in any conduct that amounts to a recognized tort and when that tort deprives the plaintiff of customers or other prospects. Liability for such losses may be imposed from defamation, disparagement, intimidation or harassment of the plaintiff's customers or employees, obstruction of the means of access to his place of business, threats of groundless suits, commercial bribery and inducing employees to commit sabotage.

As noted, defendants did not have a valid and binding non-compete agreement at the time of the alleged inappropriate and unfair competition. We have already determined that B&L's prices, customer names, contact information, and contract renewal dates did not constitute confidential business information, and therefore defendants can not be found to have improperly relied upon this information in competing with plaintiff corporation. Moreover, there is recognized authority in Tennessee supporting the proposition that "general knowledge and skill appertain exclusively to the employee, even if acquired with expensive training, and thus does not constitute a protectible interest of the employer." ***Hasty v. Rent-A-Driver, Inc.***, 671 S.W.2d 471, 473 (Tenn. 1984) (citations omitted); ***see also Wright Med. Tech., Inc. v. Grisoni***, No. W2000-01302-COA-R7-CV, 2001 WL 1683754, at *25 (Tenn. Ct. App. Dec. 18, 2001) ("However, while a former employee cannot use confidential business information, he is entitled to use the general knowledge, skill and experience he acquired over the course of his employment. (internal citation omitted). The former employee 'cannot be compelled to erase from his mind all of the general skills, knowledge and experience acquired through his experience.'") (quoting ***ILG Indus., Inc. v. Scott***, 49 Ill.2d 88, 273 N.E.2d 393, 396 (Ill. 1971)). While we find that the defendants breached their fiduciary duties to B&L by engaging in a covert scheme to establish a competing business and by soliciting the employment of Benson and Donnelly, the defendants were not prohibited by any agreement from competing with B&L after their employment with B&L ended, and were further not prohibited from incorporating and using the general skills and knowledge acquired during their employment with plaintiff corporation in establishing a competing venture.

We do not believe our finding to be inconsistent with the Middle Section's opinion in ***B&L I*** or ***B&L II***. Upon further examination, we found that the defendants did not interfere with B&L business prospects during their tenure as executive officers with plaintiff corporation. Moreover, we concluded that the defendants did not use "confidential" information to B&L's detriment before or after their termination or resignation from plaintiff corporation. In light of these facts, we find that the trial court erred in entering a judgment for B&L on its unfair competition claim.

## IV.

Stated simply, the defendants next issue asks this Court to consider whether the trial court erred in awarding a judgment in favor of B&L on its claim for unjust enrichment. Unjust enrichment is a quasi-contractual theory or is a contract implied-in-law in which a court may impose a contractual obligation where one does not exist. ***Whitehaven Community Baptist Church v. Holloway***, 973 S.W.2d 592, 596 (Tenn. 1998) (citing ***Paschall's, Inc. v. Dozier***, 407 S.W.2d 150, 154-55 (Tenn. 1966)). Such contracts are not based upon the intention of the parties but are obligations created by law and are "founded on the principle that a party receiving a benefit desired by him, under the circumstances rendering it inequitable to retain it without making compensation, must do so." ***Paschall's***, 407 S.W.2d at 154. A contractual obligation under an unjust enrichment theory will be imposed when: (1) no contract exists between the parties or, if one exist, it has become unenforceable or invalid; and (2) the defendant will be unjustly enriched absent a quasi-contractual obligation. ***Holloway***, 973 S.W.2d at 596. In ***Paschall's***, *supra*, the Court stated:

> Each case must be decided according to the essential elements of quasi contract, to-wit: A benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.

407 S.W.2d at 155.

In ***B&L I***, the court noted that B&L's unjust enrichment claim "appears to rest on Thorngren's alleged use of [B&L's] business techniques, and business property and confidential information." 917 S.W.2d at 680. The court determined that the "question of whether it would be unjust for Thorngren to profit from skills acquired during his employment is best addressed as a fiduciary duty inquiry...." *Id*. Thus, the trial court considered B&L's unjust enrichment claim solely as to the issue of whether "[B&L's] business property and confidential information were benefits conferred on, and accepted by, Thorngren." *Id*. at 681. In remanding the trial court's grant of summary judgment as to this claim, the court concluded:

> Industry custom, combined with the possibility that Thorngren may have obtained the confidential information by breaching his fiduciary duty, raise sufficient issues of material fact to warrant the remand of this issue to determine whether Thorngren retained [B&L's] business property and confidential information, and if so, whether this retention constituted unjust enrichment.

*Id*.

-35-

We are unaware of any case applying an unjust enrichment theory of recovery under circumstances similar to those in the case at bar. Quasi-contractual theory of recovery involves the willing conferring of a benefit by one party to the other and is contraindicated when the benefit alleged is involuntarily conferred. Further, under the circumstances of this case, any losses proven to have been suffered as a result of the defendants participation in a covert scheme to establish a competing business, including their improper solicitation of employees Benson and Donnelly, will be compensated via an award on plaintiff's breach of fiduciary duty claim. This conclusion is made evident by the fact that the trial court did not distinguish between the damages awarded on B&L's breach of fiduciary duty, unfair competition, and unjust enrichment claims. For these reasons, we find that the trial court erred in awarding a judgment in favor of B&L as to its claim for unjust enrichment.

## V.

Defendants next ask this Court to determine whether the trial court erred in granting a judgment in favor of B&L as to its claim for inducement to breach a contract.

In *Myers v. Pickering Firm*, 959 S.W.2d 152 (Tenn. Ct. App. 1997), the elements of a cause of action for procurement of a breach of contract are set out:

> The elements of a cause of action for procurement of the breach of a contract are: 1) there must be a legal contract; 2) the wrongdoer must have knowledge of the existence of the contract; 3) there must be an intention to induce its breach; 4) the wrongdoer must have acted maliciously; 5) there must be a breach of the contract; 6) the act complained of must be the proximate cause of the breach of the contract; and, 7) there must have been damages resulting from the breach of the contract.

*Id*. at 158.

On December 1, 1987, B&L entered into an initial contract with Krystal to implement a TJTC program and provide all services related thereto. The contract contained the following renewal and term clause:

> This Contract shall last for a period of one (1) year. The Contract shall be considered renewed for an additional yearly period unless written notice of termination is received by either party at the address listed below at least sixty (60) days prior to the yearly termination date of this contract.

Pursuant to the terms of this contract, we find that Krystal's agreement with B&L automatically renewed on December 1, 1993. On January 7, 1994, the defendants met with Krystal

representatives to discuss the terms of a potential agreement for TJTC services between T&T Corporation and Krystal. By letter dated January 12, 1994, Krystal notified B&L that they were terminating the parties' TJTC agreement as of March 13, 1994, 60 days from the date of the letter. Shortly after the mailing of this letter, the defendants entered into an agreement to provide TJTC services to Krystal.

Upon our review of the evidence in the record, we find that the trial court did not err in concluding that B&L had a valid and enforceable contract with Krystal for TJTC services on the date of Krystal's cancellation.

We further find that Thorngren, as the primary B&L contact with Krystal and an officer of plaintiff corporation, is charged with the knowledge of this customer's existing contract. With regard to whether the defendants acted intentionally in attempting to procure or induce a breach of this contract, we find that they immediately arranged for and conducted a meeting with Krystal representatives less than one week after their departure from B&L. The purpose of this meeting was to convince Krystal to transfer its TJTC business to T&T Corporation despite Krystal's existing agreement with B&L.

As for whether the defendants acted maliciously in procuring Krystal's breach, we note that "malice" is defined as "[t]he intentional doing of a wrongful act without just cause or excuse, with an intent to inflict an injury or under circumstances that the law will imply an evil intent." ***Black's Law Dictionary*** 862 (5th ed. 1979). It is undisputed that the defendants, thru Thorngren, intended to get the Krystal business which necessarily inflicted injury to B&L and is sufficient to imply an evil intent. The trial court correctly found that the defendants induced the breach of the Krystal contract.

## VI.

Defendants next ask this court to consider whether the trial court's award of $1,437,585.10 in compensatory damages was excessive. In its ruling from the bench, the trial determined:

> Now, with regards to the damages, for breach of the fiduciary duty the plaintiff made several proposals as to how those damages might be properly calculated. I have not checked to be certain that the figures that were given are correct, but I will assume so. If they are not correct, then they need to be corrected on motion.
>
> But the Court adopts the contracts and the value of those contracts, the calculation of $958,390.11, total, as the face value of the contracts and uses a multiplier of one and a half times the face of the contract, to equal [$]1,437,585.10 as the damages to which

Mr. Brodbine and the plaintiff – well, the plaintiff corporation is entitled....

On May 16, 2002, the court filed a Memorandum and Order setting forth the following "Conclusions of Law" as to B&L's breach of fiduciary duty claim:

1. In connection with Count I of the Complaint of Plaintiff B&L Corporation ("Plaintiff") for breach of fiduciary duty, judgment is entered in favor of Plaintiff and against Defendants Thomas and Thorngren.

*****************************************************

6. In connection with Count I (for breach of fiduciary duty), Count IV (for unfair competition) and Count V (for unjust enrichment), this Court orally awarded damages in favor of Plaintiff and against Defendants Thomas, Thorngren and T&T [Corporation] in the amount of $1,437,585.10. This award of damages should be a joint and several obligation in connection with the liability of Defendants Thomas and Thorngren on Counts I, IV, and V, and a joint and several obligation in connection with the liability of all three Defendants on Counts IV and V....

The court did not make separate damages awards for B&L' s breach of fiduciary duty, unfair competition, and unjust enrichment claims, instead awarding a lump sum recovery of $958,390.11 for the "face value of the contracts" against all defendants. The court then applied a multiplier of 1.5 to arrive at a total compensatory award of $1,437,585.10. As noted, the court eventually deleted its separate award of compensatory damages for B&L's intentional inducement to breach a contract claim on grounds that it "used the value of the contract to determine compensatory damages in order to make the Plaintiff whole."

Having found that the trial court erred in awarding judgments in favor of B&L on its claims for unfair competition and unjust enrichment, we hold that B&L would only be entitled to recover damages on its breach of fiduciary duty claim against defendants Thomas and Thorngren. Moreover, B&L would only be entitled to those damages that flow from these defendants' failure to notify plaintiff of their plans to start a competing business, and their improper solicitation of employees Benson and Donnelly. We stress that B&L would only be entitled to damages for actions that are related to these specific instances, and engaged in by the defendants while still executive employees of plaintiff corporation.

Because the court awarded B&L a lump sum recovery, without specifying the amount or percentage of compensatory damages attributable to each particular claim, we are unable to determine the precise amount awarded by the court on B&L's breach of fiduciary duty claim. Although we find that the trial court correctly concluded that the defendants breached their

individual fiduciary duties by (1) failing to notify B&L of their co-defendant's intent to engage in a competing business, and (2) improperly soliciting the employment of plaintiff employees Benson and Donnelly, we find that the evidence in the record preponderates against an award of damages on this claim. We note, first, that there is testimony in the record from Brodbine and B&L employee Glenn McCall that Krystal and Southwest Airlines were the only B&L clients to have breached their contracts with plaintiff corporation in favor of T&T Corporation. We find no evidence in the record to support an award of damages as to Southwest's alleged breach. The damages suffered by plaintiff as a result of Krystal's breach are more properly considered with regard to B&L's intentional inducement to breach a contract claim.

As noted, the trial court's lump sum award was based on the face value of several contracts B&L allegedly lost to the defendants as a result of unfair competition and conduct in breach of the defendants' respective fiduciary duties. B&L asserts that the defendants breached their fiduciary duties and engaged in unfair competition by soliciting plaintiff corporation's customers. It is undisputed that most, if not all, of B&L's customers contracted with B&L for a one-year period. All of these contracts had an automatic renewal clause for a one-year period if notice to the contrary was not given 60 days prior to the expiration of the contract term. By virtue of these contracts, the customers have the option to renew or shop for another provider.[8] The business involved is highly competitive and any number of providers could vie for the contracts. Since defendants have no contractual obligation to refrain from competition with B&L, they should be allowed to get in the mix for the business.

Moreover, we note that there is no evidence in the record that the B&L clients lost to T&T Corporation would have remained with B&L absent the defendants' alleged unlawful conduct. We find sufficient evidence to indicate that the success of B&L's business was premised upon the personal relationships formed by employees with its customers. The evidence further indicates that the defendants were the primary contacts for several of these clients. As such, we find that there is a distinct possibility, if not probability, that these clients would have chosen to maintain their relationships with Thomas and Thorngren and forsaken their partnership with B&L, even absent the defendants' alleged wrongful conduct.[9]

---

[8] The evidence indicates that at least three clients notified B&L by letter of their plans forego renewal of their service contracts with plaintiff corporation upon the expiration of said contracts, opting instead to solicit competitive bids for TJTC and/or unemployment cost control services.

[9] Mr. Stephen C. Thomason ("Thomason") testified on behalf of B&L's at trial. Thomason is a CEO of a competitor corporation. Thomason testified that he purchased contracts from B&L in the past because plaintiff's accounts had a profit margin of between forty and fifty percent, as compared to Thomason's seven percent profit margin.

The significant difference in profit margin suggests to this Court that B&L may have priced itself out of several contracts, regardless of the defendants' alleged wrongful conduct. Based upon these profit margins, it is possible, if not likely, that B&L's clients would have been compelled to seek an alternate and cheaper vendor for TJTC and/or unemployment cost control services.

-39-

For these reasons, we vacate the trial court's award of compensatory damages as to B&L's breach of fiduciary duty claim.

Addressing next the trial court's award of compensatory damages for intentional inducement to breach a contract, we reiterate that the trial court originally valued B&L's TJTC contract with Krystal at $70,440.19. The court's calculation was based upon the following findings:

> With regards to inducement of the breach of contract, the Court adopts the revenues generated to Thomas and Thorngren. The Court is not unmindful that in 1993 the TJTC program had lapsed and was not generating as much income in '93 as it had in years past, but it became evident that it was being reinstituted, I guess, in 1994 and 1995. In 1994 the amounts that were generated at Thomas and Thorngren under the Krystal contract was $25,131.28. In 1995 it was $44,552.91. In 1996 it was $756. The total will result in the judgment for the inducement of the breach of contract of Krystal's TJTC contract in January 1994.

The court eventually deleted the separate award for intentional inducement to breach a contract, on grounds that the court used "the value of the contract to determine compensatory damages in order to make the Plaintiff whole. Once made whole, the Plaintiff is not entitled to an additional compensatory award for the breach of this particular contract."

We find that a separate award for intentional inducement to breach a contract is warranted in this case. However, we take issue with the trial court's calculation, finding instead that B&L is only entitled to recover for Krystal TJTC revenue lost in 1994, the year immediately following Krystal's breach. We reiterate that Krystal's TJTC contract with B&L automatically renewed in December of 1993, for a period of one year. Pursuant to the terms of this contract, Krystal had the right to terminate the agreement by written notice submitted sixty days prior to expiration of the contract. Having already found that the defendants were not prohibited from competing with B&L by the terms of a valid non-competition agreement, we are unable to conclude that B&L would automatically be entitled to recover lost Krystal revenue for the years 1995 and 1996. There is no evidence that Krystal would have chosen to renew their contract with B&L after 1994. Moreover, in light of Thorngren's extensive history with Krystal, dating back to his days with Reed Roberts, we are unwilling to conclude or assume that Krystal would have renewed its contract with B&L for 1995 and 1996. Therefore B&L is entitled to recover $25,131.28, representing lost Krystal revenue for the year 1994. Pursuant to T.C.A. § 47-50-109 (2001), this amount must be trebled for a total award of $75,393.84.

As a final note on compensatory damages, we briefly address defendants' assertion that the proper measure for any award would have been B&L's proven lost profits, and not lost gross revenue. In *FTA Enterprises, Inc. v. Pomeroy Computer Resources, Inc.*, No.

E200001246COAR3CV, 2001 WL 185210 (Tenn. Ct. App. Feb. 12, 2001), the court examined the proper measure of compensatory damages in a case involving actions for interference with a contract, breach of fiduciary duty, unfair competition, conversion, and other related tort claims. The court concluded that "*[t]he proper measure of damage in this case is lost profits, other consequential losses which resulted from the wrongful interference*, and emotional distress or actual harm to reputation which result from the interference." *Id.* at \*5 (emphasis added). As support for its holding, the court cited *Dorsett Carpet Mills, Inc. v. Whitt Tile & Marble Distributing Co.*, 734 S.W.2d 322, 324-25 (Tenn. 1987). We quote at length from the Supreme Court's opinion:

> Where the injury involved is interference with a business relationship, the plaintiff's loss of profits that result from the wrongful act are a proper item to be included in the measure of damages. *See McRoberts Protective Agency Inc. v. Lansdell Protective Agency Inc.*, 61 A.D.2d 652, 403 N.Y. Supp. 2d 511 (1978); *National Merchandising Corp. v. Leyden*, 370 Mass. 425, 348 N.E.2d 771 (1976); *Coonis v. Rogers*, 429 S.W.2d 709 (Mo. 1968) and cases cited in 45 Am.Jur.2d Interference § 58. *There may be other losses suffered by plaintiffs directly and proximately resulting from the wrongful interference that should be included within the measure of damages and for that reason, it is neither possible nor appropriate to articulate an inflexible measure of damages for interference with business relationships in general or for the more limited factual situation involved in the instant case.* The measure of damages for this tort in Restatement (Second) of Torts § 774A is as follows:
>
> > (1) One who is liable to another for interference with a contract or prospective contractual relation is liable for damages for
> > (a) the pecuniary loss of the benefits of the contract or the prospective relation;
> > (b) consequential losses for which the interference is a legal cause; and
> > (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference.
> > (2) In an action for interference with a contract by inducing or causing a third person to break the contract with the other, the fact that the third person is liable for the breach does not affect the amount of damages awardable against the actor; but any

damages in fact paid by the third person will reduce
the damages actually recoverable on the judgment.

In comment d to § 774A of the Restatement (Second) of Torts the
following appears: "The tests for legal causation [of damages] for
the tort of interference with contract ... have not been reduced to
precise rules."

Some authorities have allowed business plaintiffs who were
victims of interference with their contractual relations a recovery
based in part upon profits realized by the defendant procurer of the
breach. *See Phillips Chemical Co. v. Morgan*, 440 So.2d 1292
(Fla. App. 1983), petition for review denied 450 S.2d 486 (Fla.
1984); and *Schechter v. Friedman*, 141 N.J.Eq. 318, 57 A.2d 251
(1948). While we will not rule out the possibility of the use of
such a measure in some factual situations, we are of the opinion
that generally the lost profit element of damage must be measured
by the loss sustained by the plaintiff's business and not by its effect
upon defendant's business.

*Dorsett,* 734 S.W.2d. at 324-25 (emphasis added).

Under the particular facts of this case, we find that the 1994 Krystal revenue lost by B&L
was a direct and proximate result of defendants' wrongful conduct. We therefore find that
proven lost revenue is a proper measure of recovery.

**VII.**

Defendants' final issue asks this Court to determine whether the trial court erred in
awarding B&L $25,000.00 in punitive damages against each of the defendants.

In *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992), the Tennessee Supreme
Court established the standard for determining when punitive damages are warranted, stating:

In Tennessee, therefore, a court may henceforth award punitive
damages only if it finds a defendant has acted either (1)
intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly.

A person acts intentionally when it is the person's
conscious objective or desire to engage in the conduct or cause the
result. *Cf.* T.C.A. § 39-11-302(a) (1991) (criminal definition of
"intentional"). A person acts fraudulently when (1) the person
intentionally misrepresents an existing, material fact or produces a

-42-

false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation. *See First Nat'l Bank v. Brooks Farms*, 821 S.W.2d 925, 927 (Tenn. 1991). A person acts maliciously when the person is motivated by ill will, hatred, or personal spite. A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances. *Cf*. T.C.A. § 39-11-302(c) (1991) (criminal definition of "reckless").

Further, because punitive damages are to be awarded only in the most egregious of cases, a plaintiff must prove the defendant's intentional, fraudulent, malicious, or reckless conduct by clear and convincing evidence.

*Id*. at 901.

Since defendants engaged in an intentional and covert scheme to unlawfully compete with B&L, an award of punitive damages appears permissible for breach of fiduciary duty. However, a party is entitled to recover punitive damages only if there is an award of actual damages. *See Davenport v. Chrysler Credit Corp.*, 818 S.W.2d 23 (Tenn. Ct. App. 1991). In this case, failure to prove actual damages for breaching fiduciary duties precludes recovery of punitive damages.

In sum, we affirm the trial court's order denying the motion to dismiss on the ground of *res judicata*, affirm the finding of the trial court that defendants induced or procured breach of the Krystal contract, and we modify the judgment to award plaintiff damages in the sum of $75,393.84, representing the lost revenue to the plaintiff trebled as provided by statute. We affirm the finding of the trial court that defendants, Thorngren and Thomas, breached their fiduciary duties to the plaintiff but reverse the monetary judgment awarded by the court for this claim. The judgment of the trial court awarding punitive damages against defendants, Thorngren and Thomas, is reversed.

Accordingly, the judgment of the trial court is affirmed in part, modified in part, as provided above, reversed in part, and plaintiff shall have and recover from defendants jointly and severally $75,393.84. The judgment of the trial court is otherwise reversed, as provided above. Costs of this appeal are assessed against defendants, Stephen L. Thomas, Kris R. Thorngren, and Thomas and Thorngren, Inc., and their sureties.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.