IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
OCTOBER 14, 2009 Session

# CONDOMINIUM MANAGEMENT ASSOCIATES, INC., ET AL. v. FAIRWAY VILLAGE OWNER'S ASSOCIATION, INC.

**Direct Appeal from the Chancery Court for Shelby County**
**No. 98-1056-2     Arnold Goldin, Chancellor**

---

**No. W2009-00688-COA-R3-CV - Filed February 8, 2010**

---

Property manager CMA sued homeowner's association Fairway Village when Fairway Village failed to pay money owed to CMA for management fees and property repairs. Fairway Village counter-claimed against CMA and cross-claimed against CMA President Willingham, claiming that both had defrauded Fairway Village. Following protracted litigation, the chancery court dismissed Fairway Village's claims against CMA and Willingham, finding that it had failed to carry its burden of proof. The chancery court awarded CMA a judgment for fees and repairs, as well as a reduced attorney fee, but it denied CMA's request for prejudgment interest. We affirm the chancery court's finding that CMA owed no fiduciary duty to Fairway Village, its exclusion of accountant Hood's testimony, and its award of attorney fees to CMA. We find that the chancery court's judgment was not against the weight of the evidence, and we reverse its denial of prejudgment interest. We award CMA its attorney fees on appeal. This case is remanded to the trial court for a determination of prejudgment interest and appellate attorney fees owed to CMA.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part and Remanded**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

John C. Speer, M. Ruthie Hagan, Tiffany A. Yates, Memphis, Tennessee, for the appellant, Condominium Management Associates, Inc.

Clyde W. Keenan, Memphis, Tennessee, for the appellee, Fairway Village Owner's Association, Inc.

**OPINION**

## I. FACTS & PROCEDURAL HISTORY

Pursuant to a "Management Agreement," Condominium Management Associates, Inc. ("CMA") provided administrative condominium property management services and grounds maintenance to Fairway Village Owner's Association, Inc. ("Fairway Village") for $44,984.04 annually.[1] Fairway Village claims that in March of 1998, its Board of Directors began to suspect that Fairway Village had paid for services and repairs to its property that were never rendered. In a June 16, 1998 letter, Fairway Village terminated its "Management Agreement" with CMA, stating that "the contractual obligations of CMA, particularly with regard to the maintenance of [Fairway Village] property, have not been properly performed."

CMA filed a complaint against Fairway Village for, among other things, breach of contract in November of 1998. Along with its answer, on January 22, 1999, Fairway Village filed a counter-complaint against CMA, alleging "fraud, conversion, breach of contract, breach of fiduciary duty, exaggeration of lien, cloud on title and for accounting." Fairway Village sought $100,000.00 for breach of contract and breach of fiduciary duty. Additionally, Fairway Village asserted a cross-complaint against CMA President, Robert Willingham, for fraud and conversion, seeking punitive damages of $500,000.00 jointly and severally with CMA.

On August 27, 2003, Fairway Village moved for the appointment of a special master with accounting expertise, citing the "several banker boxes of checks, receipts and bank statements which must be reconciled."[2] The next day, CMA filed a motion to compel discovery, alleging that Fairway Village had failed to answer its written interrogatories and requests for production propounded on September 9, 1999. CMA also opposed Fairway Village's motion to appoint a special master, claiming that such appointment was "unnecessary." Following a September 5, 2003 hearing, the trial court appointed Bruce Thompson as Special Master "to examine the Fairway Village bank accounts and other records during the period of January 1, 1992 through June 1998 for the purpose of determining whether the transfer of . . . $180,981.12[] of Fairway Village's funds were undocumented and whether approximately . . . $36,000.00[] in Fairway Village's income was

---

[1] The "Management Agreement" was to remain in effect from January 1, 1991 to December 31, 1992. However, it provided for automatic renewal for a like period at the end of each term if neither party terminated the agreement. The Management Agreement was renewed through December 31, 1998.

[2] Fairway Village claims that CMA took no actions to further the case from February 1999 to August 2008. CMA disputes this assertion.

overstated."

CMA and Robert Willingham filed a joint motion for partial summary judgment as to CMA's breach of contract claim on October 24, 2003. CMA and Willingham contended that no genuine issue of material fact existed as to such claim because Fairway Village's breach of the contract was clear: either Fairway Village failed to terminate the contract for cause, or alternatively, if cause existed, Fairway Village failed to afford CMA notice of its intent to terminate the contract and then to allow CMA 90 days to cure an alleged deficiency, as required by the Management Agreement. Following a hearing, the motion for partial summary judgment was denied.

Special Master Thompson filed his report with the trial court on February 17, 2006. To answer the questions submitted to him by the trial court, Special Master Thompson had engaged the services of David A. Morris, III, CPA. Morris' analysis, titled "Independent Accountant's Report on Applying Agreed Upon Procedures" ("Morris Report "), and dated July 8, 2004, was adopted by Special Master Thompson. In his report, which was adopted on March 27, 2006 without objection, Special Master Thompson made the following findings:

1. The correct amount of undocumented transfers of Fairways Village's funds is . . . $120,686.90 . . . .[3]

2. Fairway Village's income was not overstated by approximately . . . $36,000.00[.]

On April 4, 2006, CMA and Willingham moved to modify or set aside the trial court's order adopting Special Master Thompson's report, for leave to file objections to such report, to modify the report, or to recommit the report with instructions. In their motion, CMA and Willingham stated that following receipt of the Morris Report, the Special Master had requested that the parties submit comments or objections to him. CMA and Willigham claimed that "[b]y letter dated October 1, 2004, CMA and Willigham provided the Special Master and Counsel for Fairway Village with their response and objections to the Morris Report, attaching over 400 pages of documents, created at or about the time of the expenditures of approval by Fairway Village of them, to support virtually all of the expenses, withdrawals and/or wire transfers[.]" They further stated that by letter dated August 17, 2005 they "inquired into the status of the Special Master's Report, and reminded the Special Master of the documents they had previously submitted to support their response and

_____

[3] Morris found $139,915.85 of undocumented transfers from Fairway Village to CMA; however, he reduced this amount by the $19,228.95 owed to CMA for the underpayment of management fees.

objections[.]" In an affidavit attached to the motion, counsel for Willingham and CMA stated that she had recently learned that Morris was not provided copies of such documentation, and therefore, that he could not have taken such information into account in preparing his report. Morris then reviewed the omitted documents, and submitted a "Supplemental Report" on November 30, 2007. In his Supplemental Report, Morris found that of the $139,9185.85 in alleged undocumented disbursements, only $3,748.67 did not have supporting documentation, and that this amount "represent[s] the management and grounds fee for August 1995." A consent order modifying the Special Master's report to reflect the court's adoption of the Supplemental Report was entered on April 8, 2008.[4]

The matter was tried on October 6, 2008. The trial court issued lengthy findings of fact, the relevant portions of which are as follows:

> In late June 1998, Willingham was told by Thomas Jobe[, Fairway Village Board of Directors member from 1997 to 1998,] at a meeting that Fairway Village was terminating the Management Agreement.

> The termination letter dated June 16, 1998 was received by CMA at Willingham's meeting with Thomas Jobe and later by facsimile on June 26, 1998.

> . . . .

> Fairway Village had authorized the sending of a letter of May 18, 1998 to Willingham setting forth certain deficiencies in CMA's performance of its obligations under the Management Agreement . . . , requesting the deficiencies to be corrected within the ninety (90) day cure provision of . . . the Management Agreement or the "contract will terminate."

> The May 18, 1998 letter was not received by Willingham until he received the June 26, 1998 facsimile to which the May 18, 1998 letter was attached. The May 18, 1998 letter was to have been mailed May 18, 1998, but Fairway Village's representative at trial, Thomas Jobe, could not confirm it was mailed.

> CMA requested payment of the remaining balance due for fees under the Management Agreement for the year 1998, but Fairway Village refused to

_____

[4] Special Master Thompson was disqualified from the case after pleading guilty to a felony charge in an unrelated matter.

make payment.

The remaining balance under the Management Agreement is $22,492.02 plus attorneys' fees, expenses and prejudgment interest.

The Management Agreement provides that CMA can contract for services as requested by Fairway Village and arrange for additional services as requested by Fairway Village. Fairway Village authorized and contracted with CMA to make improvements and repairs to the condominium units, specifically roofs, balconies, and concrete walk-ways and foundations from time to time beginning in 1980. Significant repairs were needed to the property because of defects in the original condition.

CMA assisted in repairing about 90 balconies and correcting other defects from 1980 to 1998. The work was monitored by Fairway Village Board members. Bills were submitted by CMA to Fairway Village for work and materials for the repairs. All bills were approved and paid by Fairway Village until the June 1998 termination of the Management Agreement.

Fairway Village authorized CMA to repair and/or replace a concrete walkway and certain balconies on the Property as had been the practice previously.

CMA completed the work authorized by Fairway Village.

Fairway Village refused to pay CMA for the balance due for the work it had agreed for CMA to do and which had been completed.

. . . . .

CMA is owed $6,990.94 by Fairway Village for concrete and balcony repairs.

CMA's damages are $29,482.96 plus attorneys' fees, expenses and prejudgment interest as may be allowed by the Court.

The Management Agreement provides "[CMA] shall be indemnified and save harmless by [Fairway Village] from all claims, actions, liabilities, loss, damage, cost, or expense, including reasonable attorneys' fees, by reason of any such act or omission or in connection with [CMA's] obligations and

performance under [the Management Agreement], unless such claims . . . result from the negligence of [CMA]."

The Management Agreement also provides that "[Fairway Village] will be responsible for all collection fees including reasonable attorney fees in the event it becomes necessary for [CMA] to employ an attorney . . . [for] the collection of [CMA]'s Annual Fees."

. . . .

Pursuant to the Master Deed, [under which Fairway Village was created,] CMA as manager performed its contract "under the direction of the [Board] or the appropriate Officer of the Association."

. . . .

The testimony by Fairway Village's witnesses, representative and former board member, Thomas Jobe, and past board member H. J. Todd . . . is that the Board directed and supervised CMA's work under its contract and oversaw CMA's work for Fairway Village.

CMA provided monthly financial reports to Fairway Village's Board [of Directors] which contained monthly balance sheets reflecting balances of checking accounts, receivables and liabilities, monthly and year-to-date income statements and a budget reflecting all expenditures and collections, supporting schedules that reflected bank deposits, check disbursements and other financial information, accounts receivable balances and a property report reflecting expenditures for repairs and work done during the month. Invoices and documents supporting expenditures made by CMA were available at the Board's meetings and otherwise.

At its monthly Board meetings, Fairway Village would review the financial report, at times requested additional information or documentation from CMA, and approved the financial report as part of its Treasurer's Report as reflected in its minutes.

CMA provided information as requested at Board meetings for review by Fairway Village.

Yearly, Fairway Village engaged a certified public accountant to audit

its financial statements of revenues and expenses, balance sheets and cash flows for the year.

The audits from 1991 through 1997 reflect the financial records maintained by CMA as manager were "free of material misstatements" and did not reflect any unaccounted for expenses or revenue.

Fairway Village approved in advance all expenditures to be made by CMA and approved later the payments of those expenditures in its monthly Board meetings.

Thomas Jobe, Fairway Village's representative, testified that the audit for the year 1998 did not reflect any misappropriation of funds and that he had no knowledge of any out-of-balance accounts being reflected in that audit.

Neither Fairway Village's expert nor Thomas Jobe, its representative, had any knowledge that any expenditures of funds by CMA went to benefit someone other than Fairway Village.

No proof reflects any misappropriation of Fairway Village funds by CMA, Willingham or any other person or that its funds were not used as approved by Fairway Village.

Repair work and grounds maintenance done by CMA was monitored by Fairway Village through its Board members on a regular basis.

Fairway Village Board members would question CMA about the information in the financial reports submitted by CMA and review invoices and other back up document[s].

CMA did not exercise dominion and control over Fairway Village.

Fairway Village's expert, Lee Hood ("Hood"), a certified public accountant, prepared a Report of Findings regarding Fairway Village's accounting records, but did not conduct an audit of those records.

Hood was provided some documentation by Fairway Village but was not provided CMA's financial reports consisting of balance sheets, profit/loss statements, income statements and supporting schedules, nor were checks or other documentation provided. Hood requested additional documentation from

Fairway Village that might explain approximately $180,000 of transfers he did not have documentation to explain, but none was provided by Fairway Village.

Hood did not determine if the expenditures of $180,000 were approved by Fairway Village or that the expenditures were unauthorized.

The documents requested by Hood that were not provided would, he admits, have been helpful in making a more complete report and could not therefore resolve the discrepancies he found.

Hood did not speak with or request documents from CMA.

Hood did not agree or disagree with the Special Master's Report that the $36,319.57 of overstated bank balances which Hood opined existed did not in fact exist based on the review of additional documents by David Morris, hired by the Special Master.

No proof was submitted that any checks claimed by Fairway Village as missing were ever deposited or cashed.

The outstanding checks referenced by Hood in his July 6, 1999 Report were voided, were replaced with reissued checks, or were wire transfers made in lieu of the checks clearing, according to David Morris's testimony and his report which comprised the Special Master's Report and Modified Report.

There is no proof that any of the wire transfers did not benefit Fairway Village or were misappropriated.

Fairway Village's Board authorized telephone transfers in the past.

With the exception of $3,748.08 (which appears to be for CMA's Management Contract fee for August 1995), the transfers from the Fairway Village account to CMA were transfers that related to invoices and Job Record Sheets for work done at Fairway Village by or through CMA.

. . . .

The Modified Special Master's Report based on the Supplemental Morris Report found that of the claimed undocumented disbursements referenced during the period of January 1993 through December 1997 in the

-8-

Original Morris Report, only $3,748.67 of disbursements did not have documents related to them.

The $3,748.67 of undocumented disbursements is noted by Mr. Morris as the amount that "represent[s] the management and grounds fee for August 1995."

. . . .

The Special Master's Report and Modified Report does not conclude that any disbursements were not authorized by Fairway Village or were not for its benefit.

Fairway Village authorized all Board members and Mr. Willingham to sign checks on behalf of Fairway Village with two signatures being required.

Every month, Board members of Fairway Village received a copy of the previous month's Board meeting minutes, a list of items that needed to be repaired, a Treasurer's Report, and any written complaints from homeowners, all of which were discussed at each monthly Board meeting.

Board members discussed the Treasurer's Report in detail. Board members always approved the Treasurer's Report and approved CMA's payments.

Board members approved the annual audits between 1992 and 1998, thus ratifying all of CMA's and all of Fairway Village's expenditures for the fiscal year.

There is no evidence of any fraud or misappropriation of funds by Mr. Robert Willingham.

. . . . .

There is no evidence of any fraud or misappropriation of funds by CMA.

Fairway Village suffered no damages from the alleged conduct of CMA or Willingham.

Based on these findings of fact, the trial court awarded CMA $22,492.02, the balance owed it under the breached Management Agreement. It further found that CMA was owed $6,990.94 for concrete and balcony repairs–expenditures which Fairway Village authorized, but failed to pay. The trial court dismissed with prejudice Fairway Village's counter-claim and cross-claim, finding that Fairway Village failed to carry its burden of proof as to each. Finally, it awarded CMA attorney fees, to be later determined, and it enforced CMA's mechanic's and materialman's liens for $6,990.94. "Due to the unusual length of time taken to prosecute this case[,]" the trial court declined to award CMA prejudgment interest.

Attorney for CMA, John C. Speer, submitted an affidavit claiming legal service fees of $173,849.75, and litigation expenses of $16,136.20. Fairway Village objected, contending that the requested fees were "unnecessary and unreasonable" because the affidavit did not contain a contract between CMA and counsel, it contained only a broad statement of hours without a detailed breakdown of expenses, and because "CMA's refusal to act reasonably" necessitated the litigation's delay. Attorney Speer then filed a supplemental affidavit, with attached billing entries. On February 18, 2009, the trial court entered a final judgment, and awarded CMA reduced attorney fees of $60,000.00 along with expenses of $16,136.20. CMA timely appealed.

## II. ISSUES PRESENTED

CMA has timely filed a notice of appeal and presents the following issues for review:

1.     Whether the trial court erred in denying CMA prejudgment interest;

2.     Whether the trial court erred in reducing the amount of CMA's attorney fees; and

3.     Whether CMA should be awarded attorney fees incurred in defending Fairway Village's claim on appeal.

Additionally, Fairway Village presents the following issues for our review, as restated:

1.     Whether the trial court should have found that CMA owed a fiduciary duty to Fairway Village such that CMA bore the burden of proving it properly managed Fairway Village's funds;

2.     Whether the trial court erred in disallowing accountant Lee Hood from testifying to his findings of August 1998; and

-10-

3.      Whether the trial court's judgment to CMA was against the weight of the evidence.

For the following reasons, we affirm the chancery court's finding that CMA owed no fiduciary duty to Fairway Village, its exclusion of accountant Hood's testimony, and its award of attorney fees to CMA. We find that the chancery court's judgment was not against the weight of the evidence, and we reverse its denial of prejudgment interest. We award CMA its attorney fees on appeal. This case is remanded to the trial court for a determination of prejudgment interest and appellate attorney fees owed to CMA.

### III.   STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2008); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). When the trial court makes no specific findings of fact, we review the record to determine where the preponderance of the evidence lies. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997) (citing *Kemp v. Thurmond*, 521 S.W.2d 806, 808 (Tenn. 1975)). We accord great deference to a trial court's determinations on matters of witness credibility and will not re-evaluate such determinations absent clear and convincing evidence to the contrary. *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) (citations omitted). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

### IV.   DISCUSSION

#### A.   Fiduciary Duty

As a threshold matter, we address Fairway Village's contention that CMA owed it a fiduciary duty such that CMA should have borne the burden of showing that it properly managed Fairway Village's funds. The trial court found that "CMA did not exercise dominion and control over Fairway Village."

"Under Tennessee common law, there are two principal types of fiduciary status."

***Foster Bus. Park, LLC v. Winfree***, No. M2006-02340-COA-R3-CV, 2009 WL 113242, at *12 (Tenn. Ct. App. Jan. 15, 2009) (citing Steven W. Feldman, *Tennessee Practice: Contract Law and Practice* § 6.13 , at 504 (2006)). "The first category of common law fiduciary status consists of relationships that are fiduciary *per se . . .* such as between a guardian and ward, an attorney and client, or conservator and incompetent." ***Id.*** (citing *Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977); *Mitchell v. Smith*, 779 S.W.2d 384, 389 (Tenn. Ct. App. 1989); *Parham v. Walker*, 568 S.W.2d 622, 625 (Tenn. Ct. App. 1978)). A relationship which is not fiduciary *per se* may become a fiduciary relationship where one party has exercised "'dominion and control over another.'" ***Id.*** (quoting *Kelley v. Johns*, 96 S.W.3d 189, 197 (Tenn. Ct. App. 2002)). "This relationship, often called a 'confidential relationship,' 'is not merely a relationship of mutual trust and confidence, but rather it is one 'where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with ability, because of that confidence, to influence and exercise dominion and control over the weaker or dominated party.'"' ***Id.*** (quoting *Kelley*, 96 S.W.3d at 197; *Iacometti v. Frassinelli*, 494 S.W.2d 496, 499 (Tenn. Ct. App. 1973)); *see also Roberts v. Chase*, 25 Tenn. App. 636, 166 S.W.2d 641, 650-51 (Tenn. Ct. App. 1942). "Relationships that are not fiduciary *per se* 'require proof of the elements of dominion and control in order to establish the existence of a confidential relationship.'" ***Id.*** (quoting *Kelley*, 96 S.W.3d at 197). "Because confidential relationships can assume a variety of forms, the courts have been hesitant to define precisely what a confidential relationship is and the court must look to the particular facts and circumstances of the case to determine whether one party exercised dominion and control over another, weaker party." ***Id.*** at *13 (citing *Roberts v. Roberts*, 827 S.W.2d 788 (Tenn. Ct. App. 1991)).

"'While equity does not deny the possibility of valid transactions between the two parties, yet because every fiduciary relationship implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit, equity, raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with equitable requisites, and of thereby overcoming the presumption.'" ***Cagle v. Hybner***, No. M2006-02073-COA-R3-CV, 2008 WL 2649643, at *7 (Tenn. Ct. App. July 3, 2008) *reh'g denied* (July 31, 2008) (quoting *Roberts*, 166 S.W.2d 650-51). This presumption of invalidity extends to all transactions between the parties to the fiduciary relationship in which the dominant party obtains a benefit from the weaker party. ***Id.*** (citing *Roberts*, 166 S.W.2d at 651).

The trial court impliedly found that no fiduciary relationship existed between CMA and Fairway Village, when it stated that "CMA did not exercise dominion and control over Fairway Village." The existence of a fiduciary relationship is a question of fact to which a presumption of correctness attaches. ***Dickson v. Long***, No. M2008-00279-COA-R3-CV, 2009 WL 961784, at *8 (Tenn. Ct. App. Apr. 8, 2009) (citing *Matlock v. Simpson*, 902

-12-

S.W.2d 384, 385 (Tenn. 1995)).

The Management Agreement outlines the parties' relationship. It provides that CMA "shall operate and maintain the Association property and common area[s,]" and shall "contract for the maintenance and operation of all improvements [of] . . . common areas," "and for the maintenance of the landscaping[.]" CMA shall make repairs, and "shall hire, train, pay and discharge the personnel necessary to perform proper recurring maintenance of [Fairway Village]." Additionally, CMA must "[p]repare specifications for service contracts reflected on the Budget for approval by the Board of Directors prior to submission for bidding[,]" "obtain bids and negotiate contracts for services[,]" "[p]rovide a monthly written management report of work in progress on the property, work needing to be done, copies of unit owners' correspondence and other problems requiring the attention of the Board of Directors[,]" handle complaints and remedy existing problems, and report serious complaints to the Board. The Management Agreement proscribes CMA from expending more than $500.00 for a single item or repair or replacement without Board approval, and it disallows CMA from making structural changes without such approval.

The "CMA Complete Management Package" is attached as an addendum to the Management Agreement and provides in relevant part:

> CMA, Inc. will maintain a daily bookkeeping record of all transactions for Fairway Village. These records will be available to any member of the Board of Directors (without prior notice) during normal working hours, and upon request after hours.
> A monthly report will be issued to the Board of Directors by the 20[th] day of each month for the previous month, and year-to-date operating expenses and reserve account.
> CMA will receive and deposit all accounts receivable in [Fairway Village] bank accounts and collect all monthly assessments due from members. . . . . As a standard of practice, the Manager shall furnish the Treasurer of the Association immediately following the 20[th] day of each month with: (1) an itemized list of all delinquent accounts; (2) the amount collected during the previous month; (3) funds, if any, placed in the Reserve Fund for Replacements; (4) disbursements during the previous month; and (5) any amounts extended beyond budgetary prediction with an explanation of the causes and specifications of the authorization for making such expenditures.
> [CMA shall s]ubmit to the Board of Directors account payable checks with invoices attached to verify expenses for the designated signatures, along with a check ledger of same for the Treasurer's records.
> [CMA shall s]ubmit delinquent accounts of residents to the Board of

> Directors at the last meeting of the month, accompanied by recommendations to be taken.
>
> . . . .
>
> CMA will complete negotiations for each service contract at least thirty (30) days prior to renewal date for final approval of the Board of Directors
>
> . . . .
>
> CMA will process insurance claims for the Association and unit owner in order to maintain proper controls over the repairs.
>
> . . . .
>
> Copies of correspondence will be submitted [by CMA] monthly to the Secretary, to maintain complete records for further reference.
>
> [CMA will p]repare . . . an operating budget[, which] . . . shall be submitted to the Board of Directors of the Association at least thirty (30) days prior to the scheduled annual Association budget meeting.

Finally, the addendum describes the grounds maintenance, pool maintenance, and preventative maintenance that CMA is required to provide.

On appeal, Fairway Village argues that CMA's fiduciary duty arose because "CMA was the sole entity entrusted to conduct all affairs, financial and otherwise, on behalf of Fairway and all of CMA's operations were under the direct personal control of Willingham." Fairway Village relies upon several cases for its assertion. First, Fairway Village cites cases which hold that officers of a corporation owe a fiduciary duty to that corporation. While Fairway Village is correct that such a duty is owed by corporate officers, *see B & L Corp. v. Thomas and Thorngren, Inc.*, 162 S.W.3d 189, 205 (Tenn. Ct. App. 2004), we reject Fairway Village's contention that "CMA specifically assumed the responsibility that is normally imposed on Fairway's Board of Directors." CMA was acting under the oversight of the Board of Directors rather than as a corporate officer. Thus, CMA did not owe the fiduciary duty of a corporate officer.

Next, Fairway Village cites *Cagle v. Hybner*, No. M2006-02073-COA-R3-CV, 2008 WL 2649643, at *7 (Tenn. Ct. App. July 2, 2008) *reh'g denied* (July 31, 2008), which, quoting Hal I. Gilenson, Badlands: Artist-Personal Manager Conflicts of Interest in the Music Industry, 9 Cardozo Arts & Entr. L.J. 501, 519 (1991), states that a fiduciary relationship exists "when 'one party confides to another the management of some business to be transacted in the former's name or on his account, and by which such other assumes to do the business and render an account on it.'" However, this quotation upon which Fairway Village relies is excerpted from a "noted treatise" regarding "the fiduciary role of a manager or agent of an artist in the music industry[,]" which we find inapplicable to the instant case. Similarly, Fairway Village relies upon the case of *In re Estate of Wakefield*, No. M1998-

00921-COA-R3-CV, 2001 WL 1566117 (Tenn. Ct. App. Dec. 10, 2001) *perm. app. denied* (Tenn. July 1, 2002), in which this Court stated that "[a] party who manages the financial affairs of another has a confidential relationship with that person." (citing *Nicholas v. Wright*, 42 Tenn. App. 241, 245, 301 S.W.2d 540, 542 (1956)). Again, we find that Fairway Village has taken this quotation out of context. In *Wakefield*, this Court found a confidential relationship between an attorney and client, where the attorney drafted a will naming himself executor. *Id.* at *12-15. Similarly, in *Nicholas*, our Supreme Court found a confidential relationship between a donor and a donee niece who handled a large portion of the donor's business and who received money and land as gifts from the donor. 301 S.W.2d at 542.

We find that CMA owed no fiduciary duty to Fairway Village. The parties were not engaged in a *per se* fiduciary relationship, and the evidence does not preponderate against the trial court's finding that "CMA did not exercise dominion and control over Fairway Village" such that the existence of a fiduciary relationship could be shown. Instead, the evidence reveals that the parties were merely engaged in an arm's length business transaction, for which no fiduciary status is conferred. *See Foster Bus. Park, LLC*, 2009 WL 113242, at *13 (citing *Blon v. Bank One*, 519 N.E.2d 363 (Ohio 1988)); *see also Oak Ridge Precision Indus., Inc. v. First Tenn. Bank Nat'l Ass'n*, 835 S.W.2d 25, 30 (Tenn. Ct. App. 1992).

### B. Judgment Not Against Weight of Evidence

Next, Fairway Village asserts that the trial court's judgment was against the weight of the evidence because it allows CMA a double recovery and because it credited Willingham's testimony, which Fairway Village claims is invalid and unreliable. First, Fairway Village contests the trial court's award of $22,492.02 to CMA for unpaid management fees. Fairway Village claims that because the Special Master's reports show $24,258.34 of disbursed funds without any description, CMA has already received a disbursement of more than the amount owed it. However, our review of the Morris Supplemental Report reveals only $3,748.67 of disbursements without supporting documentation, and that amount, according to the Supplemental Report, could represent CMA's management and grounds fee.

Fairway Village also contests the trial court's award of $6,990.94 to CMA for concrete and balcony repairs, as it claims CMA had already recovered $7,418.30 for these repairs. Fairway Village cites to both a portion of the Supplemental Report evidencing payment to CMA for repairs made in 1997, as well as invoices for repairs made by CMA in 1998, to support its argument that these repair claims are somehow duplicates. Finding no support for this argument, we reject Fairway Village's contention.

-15-

Finally, Fairway Village asserts that the trial court's judgment is against the weight of the evidence because it claims CPA Morris' Supplemental Report found $78,076.01 in undocumented transfers, and Willingham, "the only witness to testify on behalf of CMA . . . .[did not] produce any evidence or documents to explain how and why Fairway's checks were missing or to validate the whereabouts or accountability of the $78,000.00 in undocumented transfers[.]"

As we stated above, we accord great deference to a trial court's determinations on matters of witness credibility and will not re-evaluate such determinations absent clear and convincing evidence to the contrary. *Wells*, 9 S.W.3d at 783. At trial, Willingham denied having knowledge of any alleged missing checks; however, Fairway Village conceded that these "missing" checks were "[s]imply unaccounted for . . . . [and] did not clear the bank." Because these "missing checks" were never presented for deposit or payment against Fairway Village's account, and therefore had no financial effect on Fairway Village, such checks do not support Fairway Village's contention that the trial court's judgment was against the weight of the evidence. Additionally, Willingham's failure to account for $78,000.00 in undocumented transfers does not render his testimony "contrary to the known facts in this case[,]" as Fairway Village suggests. CPA Morris testified that documents were provided regarding the $78,000.00 amount. However, the amount was listed under the heading "DOCUMENTS NOT IN AGREEMENT WITH AMOUNTS PER THE DISBURSEMENT LIST WHEN COMBINED WITH OTHER ITEMS REFERENCED BY CMA" because the documents provided "did not agree with the amounts on the undisbursed list." Morris explained that "for example . . . an invoice may be for $5000. There may have been a transfer for [$]2000 with the note that the $2000 applied against the [$]5000." He further stated:

> [B]ased on my review what that [$78,000.00] figure is, is that there is not a direct tie where you can say this amount was on the disbursement list. Here is an invoice that specifically matches to that. There may be an invoice or a financial statement that has an amount, but the amounts were different and again the notes that were provided said generally in that case that the disbursement amount represented a draw against those larger expenses.

We reject Fairway Village's contention that the trial court credited Willingham's testimony in contravention of the "known facts in the case." The record supports the trial court's finding that the $78,000.00 amount was supported by documentation in which Fairway Village was identified. This issue is without merit.

### C. *Testimony of Accountant Lee Hood*

When Fairway Village began to suspect wrongdoing by CMA, it hired accountant Lee Hood to "make an analysis of the accounting practices performed for the Association by [CMA] . . . . [and] to determine if any amounts [we]re due to the Association from [CMA]." Hood issued a report to Fairway Village on October 20, 1998,[5] in which he stated that after comparing bank reconciliations he prepared to those prepared by CMA for the period of January 1, 1998 to June 30, 1998, he found "several telephone transfers [totaling $9,766.34] were made during the period from the Association's checking account with no supporting documentation to substantiate these transfers." He also found $21,898.60 in checks which were written but did not clear the bank, and an unknown deposit of $4,860.51. In sum, he found that CMA owed Fairway Village $6,208.45 as of June 30, 1998. Hood prepared a second report dated July 6, 1999, in which he found undocumented transfers from Fairway Village's checking account of $180.981.12, and that the balance of Fairway Village's bank account was overstated by $36,319.57.

At trial, Fairway Village attempted to question Hood regarding his initial report, but CMA objected, claiming that the initial report had not been identified as the basis for Hood's testimony. Specifically, Fairway Village's answer to CMA's interrogatories provided:

> Please identify each and every person whom defendant expects to call as an expert witness at trial, and as to each, state the subject matter in which the expert is expected to testify.
> **ANSWER:** Lee Hood, CPA-Prepared audit of bank records of Fairway Village, July 1999

> Please state with specificity the substance of the facts and opinions to which expert identified in [the question above] is expected to testify.
> **ANSWER:** A copy of the audit report prepared by the accounting firm of Bean & Ison is included with the Answers to Request for Production of Documents . . . .

Only the second report, dated July 6, 1999, was attached to Fairway Village's response to CMA's request for production. Despite Fairway Village's statements that the initial report had been turned over to CMA, and that CMA had utilized the report in deposing Hood, the trial court refused to allow questioning regarding such report.

---

[5] This report was an exhibit to Hood's deposition. Neither Hood's deposition, nor the October 20, 1998 report were admitted into evidence at trial.

On appeal, Fairway Village claims that "[t]he failure of the trial court to allow Hood to testify about his initial evaluation had the effect of taking a significant piece of information out of the picture which helped explain Fairway's decision to not pay CMA additional funds until a full accounting could be completed." Fairway Village argues that it had a right to demand an accounting of CMA, as well as a right to withhold payments pending such accounting. Additionally, Fairway Village contends that any violation of Tennessee Rule of Civil Procedure 26.05, which requires supplementation of discovery requests in some circumstances, was harmless as CMA's knowledge of, and possession of, the report prevented any surprise. Additionally, CMA asserts that any error by the trial court was harmless, as Hood was allowed "to testify fully about the findings from a review of all available financial records in this case."

"In general, questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court." *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263 (Tenn. 1997) (citing *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993)). "The trial court's ruling in this regard may only be overturned if the discretion is arbitrarily exercised or abused." *Id.* We find that the trial court did not abuse its discretion in disallowing Hood's testimony regarding the initial report of October 20, 1998. We reject CMA's contention that Hood was allowed to testify generally regarding the information contained in the initial report; however, because Fairway Village has failed to demonstrate any wrongdoing by CMA, Fairway Village's argument regarding anticipatory breach necessarily fails, and thus, Fairway Village's motivation in terminating the Management Agreement is irrelevant.

### D. Prejudgment Interest

We next consider whether the trial court erred in denying prejudgment interest. CMA claims that it was entitled to prejudgment interest as a matter of right because its claim was "liquidated," or alternatively, that the trial court abused its discretion in denying prejudgment interest on its unliquidated claim. CMA relies upon Tennessee Code Annotated section 47-14-1099(b), which provides that "[l]iquidated and settled accounts, signed by the debtor, shall bear interest from the time they become due, unless it is expressed that interest is not to accrue until a specific time therein mentioned."

> Our supreme court in *Draper v. Great American Insurance Co.,* 458 S.W.2d 428, 432-33 (Tenn. 1970), stated that this statute applies to obligations which are liquidated or settled and "obligations where the amount can be determined by mere computation at commencement of the action."(footnote omitted). *Draper,* 458 S.W.2d at 432. In *Jaffe v. Bolton,* 817 S.W.2d 19, 28 (Tenn. [Ct.] App. 1991), this Court stated that "this section by its own terms was intended

to cover 'any written instrument, signed by the debtor, whereby he promises to pay a person named a definite sum of money, for a valuable consideration stated, at a definite time, upon a specified condition....' " *Jaffe* [*v. Bolton*]*,* 817 S.W.2d [19,] 28 [Tenn. Ct. App. 1991] (quoting *Performance Systems, Inc. v. First Am. Nat'l Bank,* 554 S.W.2d 616, 618 (Tenn. 1977).

*Peninsular Life Ins. Co. v. Chism*, No. 02A01-9205-COA-00140, 1993 WL 339299, at *6 (Tenn. Ct. App. W.S. Sept. 8, 1993).

Fairway Village contends that an award of prejudgment interest is largely in the discretion of the trial court, and that such an award is inappropriate in this case, as CMA caused "substantial delay in the prosecution of this case[.]" Fairway Village's "contention would be correct if this were an unliquidated claim." **Jaffe**, 817 S.W.2d at 28 (citing Tenn. Code Ann. § 47-14-123; *Tyber v. Great Cent. Ins. Co.,* 572 F.2d 562 (6th Cir. Tenn.1978); *Seay v. Shelby County,* 672 S.W.2d 404 (Tenn. Ct. App. 1984)). "However, when as here, the claim is liquidated then the plaintiff is entitled to prejudgment interest as a matter of right." **Id.** (citing Tenn. Code Ann. § 47-14-109; *Performance Sys., Inc., 5*54 S.W.2d 616) (finding a fixed obligation to pay rent installments pursuant to a lease agreement to be a liquidated claim). As the trial court found,

> The Management Agreement required CMA to provide administrative property management services in exchange for the payment of an annual fee of $13,452.00 from Fairway Village, which was payable in 12 equal, monthly installments of $1,121.00, due at the beginning of each month.

> The Management Agreement further provided that CMA was to maintain the grounds and common areas of Fairway Village Condominiums in exchange for the payment of an annual fee of $31,532.04 from Fairway Village, which was payable in 12 equal, monthly installments of $2,627.67, due at the beginning of each month.

> . . . .

> Fairway Village authorized CMA to repair and/or replace a concrete walkway and certain balconies on the Property as had been the practice previously.

-19-

CMA completed the work authorized by Fairway Village.

Fairway Village refused to pay CMA for the balance due for the work it had agreed for CMA to do and which had been completed.

CMA submitted invoices and bills it had paid and for expenses it had incurred to Fairway Village.

CMA is owed $6,990.94 by Fairway Village for concrete and balcony repairs.

CMA timely filed a Sworn Statement of Notice of Lien . . . with the Register's Office of Shelby County, Tennessee . . . . , for the balance due for the repairs of $6,990.94.

We find that the contract between Fairway Village and CMA is a liquidated account. Thus, prejudgment interest is statutorily required on both the balance owed to CMA under the Management Agreement and the repair expenditures made by CMA,[6] and the trial court erred in denying such award. The interest rate which is applicable is the legal rate set forth in Tennessee Code Annotated § 47-14-103. We remand to the trial court for a determination of the prejudgment interest owed to CMA.

### E. Attorney Fees

Finally, CMA asserts that the trial court erred in awarding it only $60,000 of its $175,482.25 attorney fees. "Once the court has determined that a party is entitled to recover attorney's fees, the amount of the award of attorney's fees rests within the sound discretion of the trial court, which is reviewed by the appellate courts under the abuse of discretion standard." *J & B Invs., LLC v. Surti*, 258 S.W.3d 127, 138 n.10 (Tenn. Ct. App. 2007) (citing *Mimms v. Mimms,* 234 S.W.3d 634, 641 (Tenn. Ct. App. 2007)).

"Courts should enforce provisions in contracts that expressly allow a party to recover

---

[6] In its brief, CMA argues that it is entitled to prejudgment interest on both the balance owed it under the Management Agreement and for its repair expenditures. However, in calculating prejudgment interest, CMA asks for interest on only $22,492.02. We find that CMA is entitled to prejudgment interest on both the $22,492.02 Management Agreement balance and the $6,990.94 repair expenditures, for a total of $29,482.96.

its attorney fees incurred in disputes over the contract." *Id.* (citing *Pullman Standard, Inc. v. Abex Corp.*, 693 S.W.2d 336, 338 (Tenn. 1985); *Pinney v. Tarpley*, 686 S.W.2d 574, 581 (Tenn. Ct. App. 1984)). However, an "entitlement to recover attorney's fees . . . is limited to the situation agreed to by the parties in the contract, and the fee provision is subject to the rules of contract interpretation." *Id.* (citing *Clark v. Rhea*, No. M2002-02717-COA-R3-CV, 2004 WL 63476, at *2 (Tenn. Ct. App. Jan. 13, 2004)). Regarding attorney fees, the Management Agreement provides as follows:

> [CMA] shall be indemnified and save harmless by the Association from all claims, actions, liabilities, loss, damage, cost or expense, including reasonable attorneys' fees, by reason of any such act or omission or in connection with [CMA]'s obligations and performance under this Agreement, unless such claims, actions, liabilities, loss, damage, cost or expense, including reasonable attorneys' fees, result from the negligence of [CMA], its agents or employees. The Association will be responsible for all collection fees including reasonable attorney fees in the event it becomes necessary for [CMA] to employ an attorney to enforce any of the covenants, obligations or conditions included with this agreement[, o]r the collection of [CMA's] Annual Fees included in this agreement.

The trial court specifically found that CMA was entitled "pursuant to the Management Agreement to its reasonable attorney's fees arising out of the claims made against it in connection with its performance of the Agreement as well as for the collection of the balance of its annual fees owed to it under the Agreement."[7] However, in awarding CMA a reduced fee, the trial court stated:[8]

> Well, this case started a long time ago, back in 1998, involving claims that occurred earlier than that. And I think that it obviously started out as a fairly minor what amounts to a collection case involving $130,000 and ended up being, because of a counterclaim that was filed, a case that went on and on way too long. And obviously [CMA] had to defend that case and incurred fees, but I think - - I think on both sides this case went on way too long. I don't think that this case even with these allegations, I mean, we try these cases now in

---

[7] Before the trial court, Fairway Village argued that the Agreement did not provide for the recovery of CMA's attorney fees expended in defense of the counter-claim. Fairway Village does not make this argument on appeal.

[8] The trial court incorporated its oral ruling into its "Final Judgment and Order" of February 18, 2009.

this court and they don't go on for ten years. And I don't think this case should have gone on for ten years. If depositions couldn't have been had then motions to compel could have been put down and records weren't produced then motions to compel could have been put down and things could have moved along and could have been scheduling conferences or lots of things could have been done, it wasn't any reason this case should have gone on as long as it did.

. . . The initial case probably could have been resolved for negligible attorneys' fees, but I think that because of the defense that had to be made to the counterclaim that did cause substantially greater attorneys' fees to be incurred. But even . . . so, I don't think it should have gone on to the extent that it did.

Not surprisingly, both parties contend that the other caused the protracted litigation. Fairway Village claims that CMA refused to provide requested documentation and that it failed to prosecute the case from February 1999 until August 2003. CMA, however, asserts that Fairway Village's counterclaim necessitated the case's length, and its brief states that "[t]he only factor [for a reduced fee] mentioned by the trial court in the transcript . . . is that the case took too long 'because of the counterclaim that was filed.'"[9] This assertion by CMA is clearly inaccurate, as the trial court found that both parties contributed to the litigation's delay.

Nevertheless, CMA suggests that the trial court erred in considering the litigation's length in determining the reasonableness of CMA's attorney fees. CMA argues that the trial court could properly consider only the factors listed in *Connors v. Connors*, 594 S.W.2d 672, 676 (Tenn. 1980):

1. The time devoted to performing the legal service.

2. The time limitations imposed by the circumstances.

3. The novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly.

4. The fee customarily charged in the locality for similar legal services.

5. The amount involved and the results obtained.

6. The experience, reputation, and ability of the lawyer performing the legal

---

[9]Notwithstanding this statement, CMA briefly argues that the trial court erred in reducing its attorney fee award based on the proportionality of attorney fees to the damage award. Because neither the trial court's oral statement nor it "Final Judgment and Order" based the reduced award on disproportionality, we find this issue without merit.

service[,]

as well as those factors enumerated in Supreme Court Rule 8, Rule of Professional Conduct 1.5(a):

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;
(8) whether the fee is fixed or contingent;
(9) prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and
(10) whether the fee agreement is in writing.

We find that the trial court, pursuant to Rule of Professional Conduct 1.5(a), properly considered the time and labor required in this case. The trial court apparently did not question whether the time reported by CMA's attorneys was actually spent, however, it impliedly found that such time and labor were not required under the circumstances. Furthermore, we reject CMA's contention that the trial court is limited only to the above factors. This Court has stated that "the Court can determine a reasonable fee upon consideration of all facts and circumstances presented by the record." *Hennessee v. Wood Group Enters., Inc.*, 816 S.W.2d 35, 37 (Tenn. Ct. App. 1991). We find no error in the trial court's finding that both parties contributed to the protracted litigation in this case, nor in its reduction of attorney fees based on such.

In its reply brief to this Court, CMA seeks an award of attorney fees on appeal, based on both the Management Agreement and its contention that the issues presented by Fairway Village on appeal are frivolous. We find that the Management Agreement provides for an award of attorney fees on appeal, and we remand to the trial court to determine a reasonable fee.
.

## V. CONCLUSION

For the aforementioned reasons, we affirm the chancery court's finding that CMA owed no fiduciary duty to Fairway Village, its exclusion of accountant Hood's testimony, and its award of attorney fees to CMA. We find that the chancery court's judgment was not against the weight of the evidence, and we reverse its denial of prejudgment interest. We award CMA its attorney fees on appeal. This case is remanded to the trial court for a determination of prejudgment interest and appellate attorney fees owed to CMA. Costs of this appeal are taxed to Appellee, Fairway Village Owner's Association, Inc., for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.